Milton GORDON, Martin D. Von Zamft, William Fanning, William Crandall, William Marmorstein, Vincent DeLalla, Franklyn Levenson, Joseph H. Dixon, Marve A. Dubin and Irvin Burl Schikevitz, Appellants,

v.

UNITED STATES of America, Appellee.

No. 25973.

United States Court of Appeals, Fifth Circuit.

Jan. 13, 1971.

Rehearing Denied and Rehearing En Banc Denied March 30, 1971.

William L. Kaplan, Hyattsville, Md., for Gordon; Feissner, Kaplan & Smith, Hyattsville, Md., of counsel.

Robert L. Parks, Miami, Fla., for Dixon.

Richard M. White, Miami, Fla., for Dubin.

Edward Mark Kay, Hollywood, Fla., for Schikevitz.

Martin D. Von Zamft, pro se.

Herbert L. Kaplan, Miami, Fla., for Fanning.

Harold Ungerleider, Miami Beach, Fla., for Marmorstein.

Lawrence E. Hoffman, Hoffman & St. Jean, Miami Beach, Fla., for Crandall.

E. David Rosen, Miami, Fla., for Levenson.

Barry L. Garber, Miami, Fla., for DeLalla.

Robt. W. Rust, U. S. Atty., Michael J. Osman, Asst. U. S. Atty., Miami, Fla., Robt. B. Serino, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before JOHN R. BROWN, Chief Judge, and GEWIN and THORNBERRY, Circuit Judges.

GEWIN, Circuit Judge:

The ten defendants before us were convicted under an indictment charging conspiracy to misapply funds of the Five Points National Bank in violation of 18 U.S.C. 656, 1005 and 371; and of making false entries in the records of the bank with intent to defraud in violation of 18 U.S.C. 2 and 656. After a trial lasting almost five weeks in the Southern District of Florida, before judge and jury,[1] all appellants were convicted on all counts pertinent to them and were sentenced for periods ranging from five years imprisonment to five years probation.[2] For the reasons set forth below, we reverse the conviction of appellant Levenson and remand the case against him on the issue of insanity. We affirm in all other respects the judgments of conviction against the remaining appellants.[3]

The indictment, which originally named fourteen defendants,[4] was filed August 16, 1967 and contained eight counts, Count I charged all of the appellants with conspiring to misapply funds of a national bank and specified 49 overt acts committed pursuant to the conspiracy. Counts II through Count VI charged certain officers and directors of the bank and various other defendants as aiders and abettors in making loans, alleged to be sham, the proceeds of which were converted to the use of the various defendants or others. Counts VII and VIII charged an officer of the bank with misapplication of funds by cashing checks known to be drawn on accounts with insufficient funds.

Since the facts which gave rise to this criminal prosecution are complicated, a capsule summary of the transactions will be given before proceeding to a more

---

1. Appellant Marve A. Dubin waived his right to a trial by jury and was found guilty by the court on the conspiracy count. Appellant Fanning was only named in the conspiracy count.

2. Martin Von Zamft received a five year imprisonment sentence; Milton Gordon, four years imprisonment; William Marmorstein, four years imprisonment; Joseph Dixon, two years imprisonment; William Fanning, two years imprisonment; William Crandall five years probation; Franklyn Levenson, five years probation; Marve Dubin, five years probation; Vincent DeLalla, five years probation; Irvin Schikevitz, five years probation.

3. In our review of the record we considered the sufficiency of the evidence separately as to each defendant. After full review we concluded that the evidence amply supported the existence of an unlawful conspiracy as charged. Our recitation of the facts is in the context of the meaning of a conspiracy. Accordingly, when we refer to certain overt acts as having been committed by the appellants, we do not necessarily mean that each appellant specifically and directly participated in the transaction described.

4. On February 2, 1968, defendant Donald H. Tupman entered a plea of guilty to count one of the indictment; defendants J. Carl Hill and Willard Raines entered pleas of guilty to an information charging violation of Title 18 U.S.C. 215 on November 13, 1968. The district court granted a judgment of acquittal at the close of the Government's case as to Bernard Harrison on all counts. The court also granted a judgment of acquittal as to Gordon on Count Four and as to Crandall on Counts Two and Six.

complete recitation of the relevant evidence as needed in our discussion of each alleged error. The evidence in general showed that certain of the appellants negotiated to purchase controlling interests in the Five Points National Bank from June 1964 until November 5, 1964.[5] To finance the purchase agreement, money was borrowed from local banks, and then as these loans matured fraudulent loans were arranged at the Five Points Bank to generate the funds to pay for the stock.

During this period of negotiations, the purchasing appellants used their influence to insure that certain associates would be made directors of the bank, while other associates would be placed on the loan committee. As a result, from November 5, 1964 when some of these appellants acquired control of the bank, until the end of March 1965 when the Federal Bank authorities initiated daily supervision and curtailed further loan activity, appellants, with fraud and strategem, manipulated the assets of the bank to serve their own interests. The following fraudulent practices are illustrative of the numerous transactions which led to the collapse of the bank: (1) new unsecured loans were extended to cover old unsecured loans already in default; (2) loans were granted to virtual strangers, some of whom were nonresidents of the State of Florida, based on false financial statements, and substantial portions of the loan proceeds were used for the benefit of the appellants; (3) appellants obtained unsecured loans for themselves and others to promote fictional business investments; (4) loans were obtained and disbursed in the name of certain persons without their knowledge or consent, enabling the appellants to withdraw the proceeds of such loans on forged signatures; (5) appellants privately arranged excessive, unsecured loans for themselves and their associates and then entered false minutes in the bank records to represent that such loans had been approved by the loan committee; (6) many other devious methods and subterfuges were employed in connection with loans and their disbursement: checks were cashed without endorsement by the payee, loans were made to persons whose accounts were overdrawn, false addresses were given for out-of-state borrowers, false loan applications were submitted, forged corporate resolutions were used, loans were made to fictitious borrowers, and the proceeds of many substantial loans were withdrawn immediately, often in cash. In all, appellants authorized or arranged several hundred thousand dollars in fraudulent loans during the short four and one-half months of their control of the Five Points bank. Only a small portion of these loans was ever recovered.

## I

### Conduct of the Trial

■ Appellants assert that they were denied a fair trial because (1) the court frustrated, harassed and disparaged counsel for the defense; (2) the court's extensive colloquy with counsel and witnesses alike created an atmosphere extremely prejudicial to appellants; (3) cross-examination was unduly restricted; and (4) the impaired ability of the court to hear the testimony of the witnesses and the objections of counsel was highly prejudicial to appellants.

At the outset it should be noted that this case involved eleven defendants each having his own attorney. The trial of the case lasted four and one-half weeks, with the court receiving into evidence the testimony of some sixty witnesses, and approximately 650 documents. Obviously, in a trial of this magnitude and complexity, the trial judge is entitled to

---

5. Authorized capital of the bank was 80,000 shares. The agreement negotiated called for the sale of 41,000 shares for an initial cash payment, installment notes, and the assumption of a loan at the Miami National Bank which was secured by the stock. In all the total purchase price of the stock was to be $738,000 of which $276,750 was to be paid in cash.

a great deal of latitude in order to make certain that it progresses in an orderly and efficient manner.[6] Appellants contend, however, that the court overstepped the bounds of judicial propriety by harassing and humiliating counsel, in the presence of the jury, thereby depriving them of a fair and impartial trial. In considering these contentions, we advert to the following basic principles set forth by this court in Posey v. United States:[7]

> The conduct of the trial judge must be measured by a standard of fairness and impartiality. He is not, however, a mere moderator. It is his duty to conduct an orderly trial and to make certain, as far as possible, that there is no misunderstanding of the testimony. The comments of the court were often necessary to keep the trial on the proper footing, to expedite the trial, to avoid repetition in testimony and to properly restrict examination of witnesses by multiple counsel.[8]

Applying these standards to the conduct of the trial in its entirety, we are convinced that the appellants received a fair and impartial trial with every safeguard to which they were entitled. Nevertheless, the record as a whole serves as a chastening reminder of how easily impatience in a judge can produce the appearance of unfairness. In this regard what Judge Learned Hand said in United States v. Liss[9] is pertinent:

> It may perhaps have been true that at times his manner was not as urbane as could have been wished, and counsel may have occasionally smarted under his admonitions; but we can find no evidence that he improperly cut short their examination, and certainly none whatever that he expressed even indirectly an opinion as to the guilt of the accused.[10]

The trial judge's actions indicate a persistent, but nonpartisan effort to limit the evidence to that which was relevant to the issues created by the indictment and the pleas of the defense. At times the court was abrupt though never severe in its treatment of counsel for both the Government and the appellants. But nothing appears in the record to indicate that the judge did or said anything that prejudiced appellants or their counsel with the jury. Moreover, the record amply refutes appellants' contention that the court summarily denied all of their objections and clearly demonstrates that the court sought to provide them the opportunity to develop the case fully and to assert every defense which the court felt was legally available to them. The frustration of counsel that resulted from this steadfast adherence to the issues of the case and the rules of evidence does not provide a basis for reversal.[11]

However, appellants argue specifically that the court demonstrated ineradicable bias and thereby committed reversible error by injudiciously reprimanding counsel for appellant Crandall. The disputed incident occurred during cross-examination of a Government witness when counsel asked whether the United States Attorney had instructed him to implicate one of the appellants. Following this question the trial judge called a bench conference to inquire whether counsel had any factual basis for the question. When counsel informed the court that he had no such basis, the judge pointed out that the question contained "an obnoxious insinuation" against Government counsel, and stated that he would not tolerate questions which case aspersions on other people unless based on some factual foundation. After the bench conference, the

6. Moody v. United States, 377 F.2d 175, 178 (5th Cir. 1967).

7. 416 F.2d 545 (5th Cir. 1969).

8. Id. at 555.

9. 137 F.2d 995 (2d Cir. 1943) cert. den. 320 U.S. 773, 64 S.Ct. 78, 88 L.Ed. 462.

10. Id. at 999.

11. Bernstein v. United States, 234 F.2d 475, 487 (5th Cir.), cert. den. 352 U.S. 915, 77 S.Ct. 213, 1 L.Ed.2d 122 (1956).

trial judge made this statement to the jury:

> The court excludes the question that was asked by counsel as improper because it contains an opprobrious insinuation against government counsel and cross examining counsel stated to the Court that he has no basis or proof to support this insinuation. Questions like that should not be asked unless there is some basis for them.

We find no merit in the contention that this isolated comment was of such magnitude or so pervaded the fairness of the trial that the appellants were denied a fair trial.[12] We think the trial court was justified in finding that the question was an improper insinuation as to the conduct of Government counsel and that it was necessary to have the question expunged from the jury's mind. His explanation to the jury does not indicate either bias or prejudice. Indeed, that incident and the others discussed above, were no more than indications of a firm control of the proceedings and fall well within the reasonable bounds in which a trial judge may act.[13]

 Appellants next contend that they were deprived of a fair trial because of the extensive colloquy between court and counsel. They insist that the colloquies between the court and Government counsel in the presence of the jury permitted Government counsel to testify in effect as a court sanctioned witness. By way of example, appellants call our attention to the following interchange:

Mr. Kaufman:

> Your Honor, we are now at a posture where we are through with Schedule No. E, as to Mr. Milton Gordon—I understand the court has a question.

The Court:

> Yes, I would like to ask you just what is the Government's contention in reference to Milton Gordon insofar as the testimony of the present witness is concerned.

Mr. William Kaplan:

> May this discussion be had at the Bench, your Honor?

The Court:

> The Court is inquiring of Government counsel what the Government's contention is.

Mr. Osman:

> Does your Honor care for us to approach the bench?

The Court:

> No, Sir.

Mr. Kaplan:

> If your Honor please, I would respectfully suggest that Government, stating their contentions at a point where perhaps all the proof is not yet in, might serve to prejudice the jury if it were heard in the presence of the jury.

The Court:

> Just what is your request?

Mr. Kaplan:

> My request is, your Honor, that the Government could state its contentions to the Court at the Bench rather than to the jury.

The Court:

> Oh no, the Government will probably be stating it in its final argument and in summary to the jury anyway.

Although we view the practice here complained of with disfavor, the trial judge has a wide discretion in adopting methods which will expedite a trial.[14] Moreover, while a trial judge must be careful

12. See *Glasser v. United States*, 315 U.S. 60, 82–83, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

13. See: *United States v. Cunningham*, 423 F.2d 1269, 1276 (4th Cir. 1970); *Cooper v. United States*, 403 F.2d 71, 73 (10th Cir. 1968); *United States v. Capaldo*, 402 F.2d 821, 825 (2d Cir. 1968); *Lacaze v. United States*, 391 F.2d 516, 520 (5th Cir. 1968); *Herman v. United States*, 289 F.2d 362, 365 (5th Cir. 1961).

14. *United States v. Dardi*, 330 F.2d 316, 329–330 (2d Cir. 1964), cert. den. 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50.

to avoid giving the jury an impression that he is partisan, he should take an active part when necessary to clarify testimony and assist the jury in understanding the evidence.[15] Here the testimony and the exhibits were involved and confusing, and required the court's assistance to clarify the matters for the jury. Considering the complicated issues involved in this case and the fact that the open colloquies did not disclose material of a prejudicial nature, we do not think that the trial judge committed reversible error in his conduct of the trial.[16]

It is asserted that the court improperly curtailed the scope of cross-examination. Although error is assigned to several incidents, the most serious contention focuses on the cross-examination of Government witness Kowalewski in an effort to show the bias of this witness against appellant Von Zamft. Counsel asked the witness whether she had threatened to give the Government prejudicial tapes unless Von Zamft agreed to purchase 400 shares of stock from her at a profit. The witness replied that she had not made such a threat and stated that she had given the tapes in question to her attorney. Appellant's counsel then asked:

> And wasn't that because you wanted Mr. Von Zamft to pay for your stock with a profit?

The court excluded this question as needlessly repetitive since the witness had just answered the same question.

Although cross-examination of a witness is a matter of right, the scope of the cross-examination is subject to control by the court. As the Supreme Court stated in Alford v. United States:[17] "[T]he extent of cross examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." To establish an abuse of discretion appellants must show that the restrictions imposed upon their cross-examination were clearly prejudicial.[18] Here the lack of abuse is obvious. The court restricted the right of cross-examination only after the area had been adequately explored. In this, and the other examples brought to our attention, the court extended wide latitude to appellants' counsel in their cross-examination.[19] Accordingly we ascribe no error to the court's ruling.

Appellants also assign error to the aforementioned cross-examination of the witness Kowalewski on the ground that the court's ruling foreclosed inquiry into the extent to which the Government used wiretapping devices in the development of its case. Appellants assert that their counsel attempted to elicit from witness Kowalewski whether tapes in her possession were turned over to the Government, but that the court ruled to

15. United States v. Tyminski, 418 F.2d 1060, 1062 (2d Cir. 1969).

16. See: United States v. Penner, 425 F.2d 729 (5th Cir. 1970); Posey v. United States, 416 F.2d 545, 555 (5th Cir. 1969); Ray v. United States, 367 F.2d 258, 261 (8th Cir. 1966), cert. den. 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785; Bernstein v. United States, 234 F.2d 475 (5th Cir. 1956), cert. den. 352 U.S. 915, 77 S.Ct. 213, 1 L.Ed.2d 122.

17. 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). See also: United States v. Pledger, 409 F.2d 1335, 1336 (5th Cir. 1969); Samuels v. United States, 398 F.2d 964, 970 (5th Cir. 1968); Jackson v. Beto, 388 F.2d 409, 411 (5th Cir. 1968); Hudson v. United States, 387 F.2d 331, 332 (5th Cir.

1968); Leary v. United States, 383 F.2d 851, 867 (5th Cir. 1967); Burns v. Travelers Insurance Company, 344 F.2d 70, 72 (5th Cir. 1965).

18. Harris v. United States, 367 F.2d 633, 636 (1st Cir. 1966).

19. From a full examination of the record, we think the following remark typifies the court's attitude on cross-examination: "In this case, in the interests of substantial justice, the Court has allowed each counsel for each defendant the privilege of cross-examining every witness, even though there is some doubt in the mind of the court as to whether there is a legal right under the circumstances except on the part of counsel representing defendant against whom the testimony is directed."

preclude all further questions concerning the use of the tape recordings by the Government. In making this argument appellants rely on Alderman v. United States,[20] for the proposition that when an illegal search has come to light "[t]he trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree." From our review of the record we think that this statement is inapplicable and that appellants' allegation is unfounded. Witness Kowalewski stated that she gave the tapes in question to her attorney and that she did not know what he had done with them. When appellant's counsel repeated a question previously answered in the negative the trial judge excluded the question. However, the trial judge did not rule that counsel was forbidden to question the witness to determine the extent to which the tapes were used; nor did the court preclude counsel from calling Kowalewski's attorney to ascertain what he did with the tapes. Instead counsel for appellants simply did not choose to pursue this line of questioning as an independent matter. In Nardone v. United States,[21] the Court said:

> The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wiretapping was unlawfully employed.

The fact that a witness states that he had tapes, or that his office was wired does not sufficiently demonstrate that the Government used or was even aware of this information.[22] We are convinced, therefore, that the appellants have failed to carry the burden of establishing that their constitutional rights were violated.[23]

Appellants also predicate error on the inability of the trial judge to hear the testimony of witnesses and the objections of counsel. Appellants punctuate this point with numerous record citations wherein the Court directed various witnesses to repeat themselves or to speak more distinctly. Bearing in mind that "[t]he judge has a duty to comprehend what a witness says as much as it is his duty to see that the witness communicates with the jury in an intelligible manner," [24] we have no difficulty in concluding that the trial judge, under trying conditions and with some impairment of hearing, acted fairly and conscientiously to insure that both sides received a fair trial. In this we find no error.

## II

### Insufficiency of the Evidence

■ All of the appellants stoutly maintain that the evidence was insufficient to sustain the judgments of conviction. Although we are convinced that the evidence clearly establishes guilt as to all of the appellants, we deem it appropriate to discuss some of the evidence as it relates specifically to Crandall, Schikevitz and Dubin.[25] Crandall and Schikevitz were found guilty by the jury and Dubin by the Court. As to all of the defendants, except Dubin, the jury

20. 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).

21. 308 U.S. 338 (1939) at 341, 60 S.Ct. 266, at 268, 84 L.Ed. 307. See also: Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

22. A pre-trial motion for Discovery was filed seeking "All electronic and mechanical recordings or tapes of the defendant's voice obtained through the use of any device whatsoever, or that of any alleged co-conspirator or co-defendant which has been obtained by the United States, its agents, servants, employees or representa-

tives of any type." At the hearing, Government counsel informed the court that he knew of no use by the Government of wiretapping or other electronic devices in this case.

23. Harlow v. United States, 301 F.2d 361, 373 (5th Cir. 1962).

24. Ray v. United States, 367 F.2d 258 (8th Cir. 1966) at 261, cert. den. 386 U.S. 913.

25. As to the remaining appellants, the evidence produced at the trial establishes beyond a reasonable doubt that they played a significant role in the conspiracy.

heard all of the testimony, explanations of some 650 exhibits, listened to the exhaustive summations of diligent and competent counsel and then were carefully instructed by the court as to the law applicable to the case. A full discussion of the voluminous evidence would unduly extend this opinion. The verdict of the jury was that the appellants were, on the facts and the law, guilty of both substantive crimes and of conspiracy. In arriving at the verdict it was within the jury's exclusive domain to choose between competing inferences of fact.[26]

The formula for testing the sufficiency of the evidence was stated in Glasser v. United States: "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."[27] This includes drawing all reasonable inferences and making all reasonable credibility determinations favorable to the Government.[28] Furthermore, in considering the sufficiency of the evidence we do not determine whether it establishes guilt beyond a reasonable doubt, but only whether the evidence would permit the triers of fact to find the defendants guilty beyond a reasonable doubt.[29]

### (A) Crandall

The evidence adduced at the trial, stated most favorable to the government, shows that appellant Crandall was a director and officer (Vice-President) of the Five Points Bank elected by the Board of Directors at the request of, and as a courtesy to Von Zamft, and other appellants who had purchased control of the bank. Thereafter, and throughout the entire period that he served as a director, Crandall used his position to accommodate the appellants. For example, immediately after the appellants assumed control of the bank, Crandall authorized unsecured loans to appellants Dixon and Fanning despite the fact that both had loans outstanding which were overdue and which Crandall had attempted unsuccessfully to collect. At other times he accepted spurious loan applications, initialed dubious offering tickets and extended unsecured renewal notes used by the appellants in furtherance of their conspiracy. The evidence disclosed that many of the notes approved by Crandall were accommodation notes signed by dummies, and that the proceeds were diverted to the use of the various appellants. Moreover, many of the entries in question were processed primarily if not entirely because Crandall, as an officer of the bank, set the machinery in motion. In short, from the number and nature of the transactions in which he participated, we think that the jury was warranted in finding that Crandall played an integral and indispensable role in the conspiracy.

### (B) Schikevitz

The evidence relating to appellant Schikevitz showed that during the first week after the appellants assumed control of Five Points Bank, Schikevitz applied for two substantial loans. Mr. Hochen, an accountant and director of the bank, testified that the negotiations for these loans originated in Von Zamft's office. Mr. Hochen stated that he met Schikevitz at Von Zamft's office where Von Zamft asked him to assist Schikevitz in preparing a financial statement for a loan application. Thereafter, based on this information, Schikevitz was granted unsecured loans of $10,000 and $35,000 for the expressed purpose of promoting his art business.

---

26. See United States v. Dardi, 330 F.2d 316, 325 (2d Cir. 1964).

27. 315 U.S. 60 at 80, 62 S.Ct. 457 at 469, 86 L.Ed. 680 (1942).

28. See: Grant v. United States, 407 F.2d 56, 57 (5th Cir. 1969); Tillman v. United States, 406 F.2d 930, 939 (5th Cir. 1969); Davis v. United States, 385 F. 2d 919, 921 (5th Cir. 1967); Moody v. United States, 377 F.2d 175, 177 (5th Cir. 1967); Duncan v. United States, 357 F.2d 195, 197 (5th Cir. 1966).

29. Blachly v. United States, 380 F.2d 665, 675 (5th Cir. 1967).

The evidence showed, however, that the proceeds of the loans were not used for the purpose stated, but for the benefit of the other appellants. Bank records revealed that on the same day that Schikevitz's account was credited with the loan proceeds, a check was drawn on his account and cashed at the Five Point Bank in the amount of $25,000. On the same day, November 16, 1964, Marmorstein purchased, with cash, a cashier's check for $16,000 and in addition made a $6,100 cash deposit to the account of Levenson and/or Gordon at the Five Points Bank. The $16,000 cashier's check was used to pay a loan of the Larso Development Company, a company owned and controlled by appellants Marmorstein, Levenson, Fanning and Von Zamft. On the following day, November 17, 1964, Schikevitz gave Marmorstein a check for $1,700 which came directly out of the loan from the Five Points Bank. This check was in turn deposited to Marmorstein's account which at that time had a balance of $31.95. From this account Marmorstein drew a check for $1,716 payable to Security Underwriting Consultants, Inc. to cover an interest payment on the loan made to purchase Five Points Bank stock. On the same day, Schikevitz drew a second check payable to cash for $1,000. An employee of Von Zamft, Juan Alfonso, testified that Von Zamft gave him the check in the presence of Schikevitz and directed him to cash it. Alfonso proceeded as directed, cashed the $1,000 check and returned the money to Von Zamft. On the same day, Levenson deposited $1,000 in cash to eliminate an overdraft.

Based upon the above facts, it was reasonable for the jury to infer that the $22,100 in cash used by Marmorstein on November 16, 1964 for his benefit and for the benefit of appellants Levenson, Fanning, Gordon and Von Zamft came from the proceeds of the loan granted to Schikevitz expressly for the purpose of promoting his art business. In addition, considering the close relationship which Schikevitz had with the other appellants, and his involvement in numerous other financial transactions at the Five Points Bank, we think it was clearly a jury question whether Schikevitz was involved in the conspiracy to misapply funds of the Five Points National Bank.

### (C) *Dubin*

◼ We consider next the question of the sufficiency of the evidence raised by appellant Dubin who was tried without a jury before the court.[30] Because of the complicated and involved nature of the transactions in which Dubin participated, it is necessary to present the following somewhat detailed statement of facts.

In early December of 1964 William Marmorstein, a director of the Five Points National Bank, asked Dubin to lend Samuel Goodman (Marmorstein's father-in-law) money to help him in his business. At that time Dubin was desperately short of funds; in fact on December 17, 1964 his account at the Miami National Bank was overdrawn in the amount of $79.65. Nevertheless, Dubin agreed to give Marmorstein a check for $4,500 to give to Goodman knowing that he lacked sufficient funds to cover the

---

30. Since Dubin was tried by the court, without a jury, our task in reviewing the findings of the trial court is to determine whether such findings are supported by any substantial evidence. It is not our function to make credibility choices or to pass upon the weight of the evidence. The test is whether the evidence is sufficent to justify the trial judge, as trier of the facts, in concluding beyond a reasonable doubt that the defendant was guilty, and that such evidence is inconsistent with any reasonable hypothesis of his innocence. Such is the substantial evidence test. De Luna v. United States, 228 F.2d 114, 116 (5th Cir. 1967); Jelaza v. United States, 179 F.2d 202, 204-205 (4th Cir. 1950). See also: Battles v. United States, 388 F.2d 799, 802 (5th Cir. 1968); Government of Virgin Islands v. Lake, 362 F.2d 770, 775 (3d Cir. 1966); Wright, Federal Practice & Procedure § 374 (1969).

check. Dubin's explanation for this curious commitment of nonexistent funds was that he thought that Marmorstein would eventually cover the check. When asked why Marmorstein would be seeking help from someone else if he were able to raise the money him-self, Dubin was unable to respond.

Shortly after the agreement between Marmorstein and Dubin, on December 18, 1964 Dubin filed a loan application at the Five Points National Bank. Although the Five Points Bank was not the bank where Dubin customarily did business, he was permitted to make a $10,000 unsecured loan for "business purposes" on the same day of his loan application. The proceeds of this loan totaling $9,-822.50 were disbursed to Dubin in the following manner: $822.50 was deposited to open a checking account at the Five Points Bank in the name of Marvin Dubin, and $9,000 was given to Dubin in cash.

Four days after the loan was executed, on December 22, 1964, Dubin issued a check for $4,500 payable to Samuel Goodman; he then delivered the check to Marmorstein. Marmorstein, however, did not deliver the check to Goodman. Instead he forged Goodman's signature as an endorsement to himself and deposited the check to his own account at the Jefferson National Bank on December 28, 1964. Testimony at the trial indicated that Goodman was never a party to the above transaction and never had any knowledge of the check,

Since Dubin's account did not have sufficient funds to cover the Goodman check when it was drawn, he was forced to deposit $4,500 on December 28, 1964 when Marmorstein deposited the check. The records of the Miami National Bank show that Dubin's deposit consisted of (1) $4,000 in cash, and (2) a check dated December 29 for $500 drawn on Dubin's new account at Five Points, which contained only the $822.50 deposited from the original $10,000 loan at that bank.

On January 7, 1965 Dubin applied for and was granted a second unsecured $10,000 loan from the Five Points National Bank. The purported purpose for this loan was "operating funds, for dining and night club operations in conjunction with an apartment house." Appellant Crandall gave his approval to the loan application, and the proceeds of the loan were credited to Dubin's account. On the same day Dubin issued a check to "cash" for $6,000 and immediately cashed it at Five Points National Bank. On January 9, 1965 Dubin issued a second check on his account at the Miami National Bank for $4,500 payable to Marmorstein and gave this check to him in person. Marmorstein deposited this check to his account at the Jefferson National Bank, but it did not clear the bank since Dubin had insufficient funds in his account to cover it.

Based on this evidence it is reasonable to infer that the $4,500 paid by Dubin to Marmorstein (via the check to Goodman) was really a pre-arranged division of the proceeds from the first $10,000 loan and served as a condition precedent for Marmorstein to arrange the loan.[31] In this regard the evidence shows indisputably that $500 of the $4,500 came directly from the Five Points loan. In addition, although it was impossible to trace the exact source of the remaining $4,000, since this was an amorphous cash deposit, examination of Dubin's bank account conclusively demonstrated that Dubin could not have made the $4,500 pay-

---

31. To this effect damaging testimony by David D. Phillips, attorney for Five Points Bank, could have been used. Mr. Phillips testified that Dubin borrowed $10,000 for himself and $10,000 for Marmorstein and Von Zamft because "if he had borrowed from the Shylocks it would cost him a lot of money." However, Judge Holtzoff refused to give weight to this evidence because:

\* \* \* liberty is too precious to deprive a person of it on the basis of a conversation between two men of good repute, that took place several years ago, when one says it took place and the other says no such conversation took place.

ment to Marmorstein without the loan from the Five Points Bank. And finally, given the fact that Marmorstein was on the Board of Directors of the Five Points Bank and was in a position to secure loans for Dubin, it becomes clear how Dubin who was in extreme financial difficulty was able to obtain two successive unsecured loans for a total of $20,000 from a strange bank and why Dubin would agree to give Marmorstein a total of $9,000 (or approximately one-half of each loan which he received from the Five Points Bank) that he so desperately needed for his own business ventures.

It is epigrammatic that a conspiracy is seldom born of open covenants openly arrived at.[32] Proof of the existence of a conspiracy must frequently rest upon inferences drawn from relevant and competent circumstantial evidence, including not only the defendant's circumstances but also his conduct in those circumstances. Without attempting to determine the factual issue ourselves, it seems unreasonable to conclude that Dubin, a man in desperate financial condition, would borrow $20,000 in order to lend almost half of that amount to a director and officer of a national bank, especially when the only reason of explanation was that they were friends. Much more plausible is the inference drawn by the trial court that Dubin was either making a pre-arranged refund of the money borrowed from the Five Points Bank, or that he was paying a fee or gratuity to Marmorstein for arranging the loan. We conclude, therefore, that the trial judge had substantial evidence to reject Dubin's hypothesis of innocence as being unreasonable and to support his finding that Dubin was part of the conspiracy to misapply funds of the Five Points National Bank.[33]

 Appellant Dubin assign additional error on the ground that the trial judge adversely commented on his failure to testify, thereby violating his constitutional rights. The comment in question occurred after counsel for both the Government and for Dubin had rested their case, and while counsel for Dubin was making his closing summation. At that point counsel requested permission from the court to reopen Dubin's case in order to allow Dubin himself to testify. The trial judge granted the request but commented that this was a most unusual procedure:

The Court:

In view of the fact that this is without a jury and in view of the rather unusual situation presented by a defendant who did not want to take the stand, and all of a sudden he says that he does, I am going to ask a question of him before you proceed * * * The question is: *Why did you change your mind about taking the witness stand?*

Dubin:

Personally, I felt that the Government had not even attempted to present a case that warranted my taking the stand. I am here now for the purpose of answering whatever questions your Honor cares to ask me.

The Court:

I must say that if he had taken the witness stand—*Well, anything that he says now will be weakened by the fact that he did not take the stand in the first place. However, I will hear him.* (emphasis added).

Dubin argues that the trial court with the above comment violated his Fifth Amendment right to remain silent because the court punished him in effect for his failure to testify earlier in the trial. In making this argument Dubin contends that the comment of the court comes within the prohibitive ambit of Griffin v. California.[34] We do not agree. In *Griffin*, the Supreme Court forbid

---

**32.** Lacaze v. United States, 391 F.2d 516, 520 (5th Cir. 1968).

**33.** See: Gorman v. United States, 323 F.2d 51, 52–53 (5th Cir. 1963).

**34.** 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed. 2d 106 (1965).

both the prosecutor and the court from making adverse comments on the accused's failure to take the stand in a criminal jury trial.[35] Since Dubin's trial was not by jury and since the court's comment was directed toward the credibility of Dubin's testimony rather than to his failure to testify,[36] *Griffin* seems inapposite. Nevertheless, even assuming that the court's remark was improper, we think in the context of this case that the comment constituted harmless error within the standard established in Chapman v. California.[37] This is not the usual case in which the complaining defendant actually did not testify. In this case Dubin took the stand as a result of his special request to permit him to do so after he had rested his case.

### (D) *Summary*

Even though we have not set forth in detail the voluminous evidence applicable to the other appellants, we have tediously reviewed the record and exhibits reflecting their activities, connections and dealings with the Bank in question. We have not the slightest doubt that the evidence constitutes clear, convincing and overwhelming proof of the guilt of all of the other appellants as well as Crandall, Schikevitz and Dubin. Most of the appellants were widely experienced business men. Several of them were lawyers.

From the very beginning of their activities they sought to camouflage and conceal their unlawful purpose and design. They demonstrated unusual ingenuity and techniques in making their actions appear to be normal and regular when they were just the opposite as a matter of fact.

### III

### *Prejudicial Publicity*

We next consider appellants' argument that the court erred in denying their motions for mistrial and to poll the nonsequester jury to determine whether any members had been exposed to newspaper publicity concerning the trial.

On the day that the jury was empanelled, an article captioned "Five Points Bank Case Jury Being Selected" appeared in the evening edition of a widely circulated local newspaper. The article consisted largely of a routine account of the factual events of the trial, and was essentially devoid of any editorial flavoring. It discussed generally the nature of the case, mentioned the names of the defendants charged, and the punishment involved.[38]

The day following the publication appellants filed a written motion for a mistrial and at the same time requested that the court poll the jury to ascertain

---

35. Id. at 615, 85 S.Ct. 1229.

36. In a non-jury trial the court must determine the credibility of the witness. And in general, credibility determinations are not reviewable on appeal. See: United States v. Caci, 401 F.2d 664, 670 (2d Cir. 1968); United States v. Washington, 253 F.2d 913, 915–916 (7th Cir. 1958); United States v. Cook, 184 F.2d 642, 644 (7th Cir. 1950).

37. 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman*, the Court stated that:
"* * * before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."
Id. at 24, 87 S.Ct. at 828. See: United States v. James, 432 F.2d 303 (5th Cir. 1970).

38. The article read in part:
Selection of a jury was under way today in federal court to hear the complicated case of the Five Points National Bank alleged fraud conspiracy.
Eleven men, some of them officers and directors of the ill fated bank are charged with arranging a series of phony loans amounting to more than $600,000.
The bank, at 1699 Corral Way opened in 1963 and closed in January, 1966. It was the first big bank failure in the Miami area since the 1930s.
* * * * *
The eleven accused are * * * (the eleven appellants). If found guilty, each could get up to five years in prison and a $10,000 fine.

whether they were exposed to the article. After rereading the article in court, the trial judge ruled that the article was not prejudicial and that he did not wish to implant ideas in the juror's mind by polling them.[39]

During the second week of the trial an article appeared in a local newspaper under the headline "Order (And Speed) In The Court". Focusing primarily on the distinguished trial judge, the article gave a résumé of his legal career, commented on his outstanding legal record, and described the manner in which he conducted the trial. The text of the article did not mention the appellants by name; nor did it make any suggestion as to their guilt. Nevertheless, appellants filed a motion for a mistrial and again specifically requested that the jury be polled. Both the motion and the request were denied, the court ruling that the article was not prejudicial.

Although appellants argue that they did not receive a fair trial before an impartial jury because of the attendant trial publicity, they make no claim of actual prejudice. Instead they rely upon Mares v. United States [40] for the proposition that the trial judge must poll members of the jury as a matter of course whenever potentially prejudicial publicity may have reached them; and they allege error since the court refused to honor their mandatory request. We think appellants' reliance on Mares is misplaced. In Mares, the controverted article reported that the defendant had confessed to the crime charged against him, but that the court had ruled the confession inadmissible. In response to the argument that this highly prejudicial matter might reach the jury,[41] the court said:

> [W]e have an extreme situation, the reporting during the trial of a withdrawn guilty plea and an excluded confession. If any juror even saw the headline and connected it with the trial in progress, the possibility that it would not prejudice that juror is so slight that it merits no consideration. Id. at 809.

It is important to note that the court in Mares did not hold that a defendant was entitled as a matter of law to have the jury polled on the question of whether any member had been exposed to extrajudicial publicity:

> The right to publish a prejudicial article does not carry with it the right of an accused to an automatic mistrial. Such an outcome would give to the press a power over judicial proceedings which may not be countenanced * * * It has been well said that: "Appellate courts should be slow to impute to juries a disregard of their duties." [Fairmont Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933)].[42]

Whether publicity is so prejudicial as to require a mistrial is ordinarily committed to the trial court's discretion.[43] Appellants fail to recognize

---

39. THE COURT:
 Now, that article does nothing but give a summary of some things that were said and happened in the courtroom and are of record. * * * I don't see anything prejudicial there and, sometimes, you know, if you ask unnecessary questions of the jury, you might plant ideas in juror's minds unintentionally and that might be undesirable.

40. 383 F.2d 805 (10th Cir. 1967).

41. If the fact that an accused has confessed enters into the jury's deliberation, without *a prior determination by the court*

that it was voluntary and therefore admissible, a conviction will be reversed regardless of how clearly it is supported by other evidence. See Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908 (1964). This result attests to the highly prejudicial nature of a confession by the accused, and explains in part the reaction of the court in Mares.

42. Id. at 809.

43. See: Howard v. Swenson, 404 F.2d 469, 473 (8th Cir. 1968); Smith v. United States, 385 F.2d 34, 39 (5th Cir. 1967); United States v. Kompinski, 373 F.2d 429, 432 (2d Cir. 1967); United

that the scope of this judicial discretion includes the responsibility of determining the extent and type of investigation requisite to a ruling on the motion.[44] It is for the trial judge to decide at the threshold whether news accounts are actually prejudicial; whether the jurors were probably exposed to the publicity; and whether jurors would be sufficiently influenced by bench instructions alone to disregard the publicity. In making his determination the trial judge must consider such things as (1) the character or nature of the information published, some being more sensational or penetrating than others; (2) the time of the publication in relation to the trial; (3) the credibility of the source to which the information is attributable and (4) the pervasiveness of the publicity, that is, the extent of the audience reached by the media employed and the interest evoked. With so many variables involved, every claim of jury prejudice because of newspaper articles appearing during a trial must turn on its own facts from examination of the total circumstances surrounding a given case.[45] For this reason, the Supreme Court said in Marshall v. United States [46] that:

> The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021]. *Generalizations beyond that statement are not profitable because each case must turn on its special facts.*[47] (Emphasis added)

It is instructive to note that in *Marshall* the following circumstances existed: (1) the newspaper articles were of an extremely prejudicial nature in that they indicated that the defendant had been convicted of other crimes; and (2) the articles had reached at least seven of the jurors, four of whom had actually read one or more of the newspaper articles. By comparison, in the case under consideration the questioned articles gave factual reports of the proceeding and were barren of inflammatory matter.[48] In addition, the trial judge repeatedly admonished the jury not to read or to listen to the news media during the pendency of the trial. And finally, there was no showing that a juror read or even saw any of the alleged offending articles; it is merely urged that they must have seen them. To conclude on this basis that appellants were denied a fair trial would require the application of a dual presumption: that the jurors ignored the repeated instructions of the court and that they were prejudicially influenced by the news stories involved. Yet the law will presume neither: "Appellate courts should be slow to impute to juries a disregard of their

States ex rel. Stickler v. Tehan, 365 F.2d 199, 202 (6th Cir. 1966); United States v. Armone, 363 F.2d 385, 396 (2d Cir. 1966); Addison v. United States, 317 F.2d 808, 814 (5th Cir. 1963); United States v. Feldman, 299 F.2d 914, 917 (2d Cir. 1962); Bullock v. United States, 265 F.2d 683, 696–697 (6th Cir. 1959).

44. United States v. McGann and Pruitt, 431 F.2d 1104 (5th Cir. 1970); Tillman v. United States, 406 F.2d 930, 938 (5th Cir. 1969). See also: Ford v. United States, 233 F.2d 56, 62 (5th Cir. 1956); United States v. Flynn, 216 F.2d 354, 372 (2d Cir. 1954).

45. Jenkins v. Kropp, 424 F.2d 665, 667 (6th Cir. 1970).

46. 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

47. Id. at 312, 79 S.Ct. at 1173.

48. As in Beck v. Washington, 369 U.S. 541, 556, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), here even the front page items were straight news rather than invidious accounts tending to arouse ill-will and vindictiveness. To hold such responsible journalism prejudicial would beg for total censorship of the news media.

duties * * * "[49] Otherwise, as Mr. Justice Holmes observed: [50]

> If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day.

While the Supreme Court has reversed convictions without a showing of jury prejudice in extreme cases because of "inherently prejudicial publicity which saturated the community," [51] we are in accord with the view that where publicity prior to and during a trial is neither inherently prejudicial nor unusually extensive, the accused must assume the traditional burden and show actual jury prejudice.[52] In the circumstances of this case, therefore, we are unable to conclude that the trial court abused its discretion in refusing to poll the jury.[53]

## IV

### Testimony of Alleged Informers

Appellants contend that the trial judge committed error by not suppressing the testimony of certain witnesses used by the Government on the basis that they were "informants." [54] The logical thread of their argument runs as follows: (1) the Government filed a Bill of Particulars stating that they did not use informers (or informants as stated by appellants) in the preparation of its case; (2) some witnesses who testified were informers; (3) therefore, their testimony should have been suppressed since it is well established that a bill of particulars strictly limits the prosecution to proof within the area of the bill.[55]

Conceding the validity of this syllogism, we are unable to accept appellants' definition of the word "informant." In their brief appellants maintain that anyone who participates in and furnishes information about a transaction is an informer.[56] Such a broad definition fails to comprehend the reason for this functional classification. At common law, the prosecution in a criminal case was ordinarily privileged to withhold from an accused the identity of

**49.** Fairmont Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933). See: Hale v. United States, 435 F.2d 737 (5th Cir. 1970); United States v. Acuff, 410 F.2d 463, 467 (6th Cir. 1969); Sevey v. United States, 403 F.2d 691, 692 (5th Cir. 1968); Welch v. United States, 371 F.2d 287, 291 (10th Cir. 1966) cert. den. 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303; Hilliard v. State of Arizona, 362 F.2d 908, 910 (9th Cir. 1966).

**50.** Holt v. United States, 218 U.S. 245, at 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910).

**51.** Sheppard v. Maxwell, 384 U.S. 333 (1966) at 363, 86 S.Ct. 1507 at 1522, 16 L.Ed.2d 600. See Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Turner v. State of Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). See also: Pamplin v. Mason, 364 F.2d 1, 4 (5th Cir. 1966).

**52.** Hale v. United States, 435 F.2d 737 (5th Cir. 1970); Gawne v. United States, 409 F.2d 1399, 1401 (9th Cir. 1969);

Sevey v. United States, 403 F.2d 691, 692 (5th Cir. 1968); Williams v. Dutton, 400 F.2d 797, 802 (5th Cir. 1968); Morgan v. United States, 399 F.2d 93, 97 (5th Cir. 1968).

**53.** See: United States v. Caci, 401 F.2d 664, 672 (2d Cir. 1968); United States v. Hoffa, 367 F.2d 698, 715 (7th Cir. 1966); United States v. Edwards, 366 F.2d 853, 873 (2d Cir. 1966); United States v. Jannsen, 339 F.2d 916, 919–920 (7th Cir. 1965); Swallow v. United States, 307 F.2d 81 (10th Cir. 1962) cert. den. 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499.

**54.** This contention is asserted broadly as to several witnesses, but it focuses particularly on Robert L. Smith, Sidney Stein, Aaron Goldman and Leonard Glass.

**55.** United States v. Murray, 297 F.2d 812, 819 (2d Cir. 1962); United States v. Neff, 212 F.2d 297, 309 (3d Cir. 1954).

**56.** Appellants seem to use the words "informant" and "informer" interchangeably at times, but at other times they appear to use "informant" as a variation of the word "informer".

**875**

persons who furnished information relating to violations of the law. The privilege was founded upon public policy to protect effective law enforcement. As the Supreme Court explained in Roviaro v. United States: [57]

> The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

> The scope of the privilege is limited by its underlying purpose * * * (O)nce the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

Generally speaking, therefore, an informer is an undisclosed person who confidentially volunteers material information of violations of the law to officers charged with enforcement of that law.[58] As we understand the term, persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of an investigation, are not informers.[59] Moreover, a distinction is often made in the federal cases based on whether the person is an active participant in the offense with which the defendant is charged or is a "mere informer" who only supplies a "lead" to law enforcement officers for their investigation of the crime.[60] According to this distinction, a participant in the transaction upon which the charge against the accused is based often is not treated as an informer. It follows, therefore, that the witnesses whose testimony was challenged were not informers. Rather than being "mere informers" supplying leads, these witnesses were actually involved in the financial transactions of the Five Points Bank. In addition, as far as the record shows, the witnesses did not confidentially volunteer information. They were approached and interrogated by law enforcement agents. In some instances the witnesses disclosed to several of the appellants that they were being interviewed by Government agents as well as the nature and content of the statements given to the investigating agents. Furthermore the Government furnished appellants with Jencks material containing the statements of each witness before they testified to that disclosure of identity was never a problem. And finally, in view of the length of the trial which lasted more than a month, it cannot be reasonably contended that the appellants did not have ample opportunity to prepare their defenses on every aspect of the testimony. Thus we conclude that the appellants were not injured or surprised by this testimony.[61]

57. 353 U.S. 53 at 59, 77 S.Ct. 623 at 627, 1 L.Ed.2d 639 (1957).

58. See: Roviaro v. United States, 353 U.S. 53, 59 (1957); Black v. Sheraton Corporation, 47 F.R.D. 263, 265 (D.C.1969).

59. See: United States v. Frank, 23 F.R.D. 145 (D.C.1959).

60. Roviaro v. United States, 353 U.S. 53 (1957); Miller v. United States, 273 F. 2d 279 (5th Cir. 1959) cert. den. 362 U.S. 928, 80 S.Ct. 756, 4 L.Ed.2d 747; Gilmore v. United States, 256 F.2d 565 (5th Cir. 1958); Portomene v. United States, 221 F.2d 582 (5th Cir. 1955); United States v. Conforti, 200 F.2d 365 (7th Cir. 1957) cert. den. 345 U.S. 925, 73 S.Ct. 782, 97 L.Ed. 1356; Sorrentino v. United States, 163 F.2d 627 (9th Cir. 1947); 76 A.L.R.2d 262.

61. See United States v. McCarthy, 292 F. Supp. 937, 940 (S.D.N.Y.1968) wherein the court said:

> The purpose of a bill of particulars is to aid the accused in preparation of his defense, to prevent surprise at trial and to permit the accused, "after judgment, * * * to plead the record and judgment in bar of a further prosecution for the same offense." It is not intended, however, to give defendants a preview of the government's case.
>
> * * * * *
>
> Particulars seeking the names of witnesses have almost uniformly been denied. *The names of informers are privileged. Their identity need not be disclosed until defendants show that disclosure is relevant, necessary and helpful to the defense. No such showing is made here.* (Emphasis added)

## V

### *Transcript*

■ Appellants predicate error on the refusal of the trial court to order copies of the daily transcript to the five indigent defendants claiming that this effectively denied them of their right to counsel. Since the Government's copy of the daily transcript was made available to appellants each day after the proceedings, we think Leyvas v. United States [62] is dispositive:

> There is no basis in law or fact to predicate error on the refusal of the trial court to order a daily transcript for the defendant at the expense of the United States. Apparently counsel for the appellants used part of the daily copy. Even if there were a suggestion that appellants might be legally prejudiced by the refusal, which there is not, this circumstance would remove all grounds of complaint.

## VI

### *Use of Charts*

Appellants insist that the trial court erred in permitting the Government's expert witness, FBI Agent Brady, to identify and explain charts summarizing the evidence. Appellants maintain that the court allowed Brady to "usurp the exclusive function of the jury" by extrapolating his deductions, conclusions and opinions from the primary evidence.

■ While the use of summaries in cases involving complicated documentary proof has been approved in numerous cases by this court,[63] as well as other courts,[64] we have emphasized that a trial court is charged with grave responsibilities to make certain that an accused is not unjustly convicted in a "trial by charts." [65] In Baines v. United States [66] we expressed this concern:

> Although this Court has adopted the general rule that the admission of charts summarizing a revenue agent's computations is discretionary with the trial court, and that its rulings are subject to review only upon a clear showing of abuse and resulting prejudice to an accused, we are not being unmindful of the fact that the use of this type of evidence has inherent dangers to an accused. A jury may be unduly impressed by the apparent authenticity of a government witness' chart computation, as such, rather than the truth and accuracy of the *underlying facts* and figures supporting them. (Emphasis added)

When summaries are used, therefore, the court must ascertain with certainty that they are based upon and fairly represent competent evidence already before the jury.[67] In addition, the better practice is to require that the primary evidence be available to the opposing party and to afford a reasonable opportunity for comparison in order that the cor-

62. 264 F.2d 272, 277 (9th Cir. 1958) cert. den. 359 U.S. 936, 79 S.Ct. 651, 3 L.Ed. 2d 637 (1959).

63. See: Kroll v. United States, 433 F.2d 1282 (5th Cir. 1970) ; Baines v. United States, 426 F.2d 833, 839–840 (5th Cir. 1970) ; Rotolo v. United States, 404 F. 2d 316, 317 (5th Cir. 1968) ; Bruce v. United States, 351 F.2d 318, 321 (5th Cir. 1965) ; Greenhill v. United States, 298 F.2d 405, 412 (5th Cir. 1962) cert. denied, 371 U.S. 830, 83 S.Ct. 25, 9 L. Ed.2d 67 ; Azcona v. United States, 257 F.2d 462, 465 (5th Cir. 1958) ; Lloyd v. United States, 226 F.2d 9, 16 (5th Cir. 1955) ; Cooper v. United States, 91 F. 2d 195, 198 (5th Cir. 1937).

64. United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943) ; United States v. Rath, 406 F.2d 757 (6th Cir. 1969) ; United States v. Goldberg, 401 F.2d 644, 647 (2d Cir. 1969) ; United States v. Mackey, 345 F.2d 499, 507 (7th Cir. 1965) ; Swallow v. United States, 307 F.2d 81, 84 (10th Cir. 1962) ; United States v. Doyle, 234 F.2d 788, 794 (7th Cir. 1956).

65. Lloyd v. United States, 226 F.2d 9, 16 (5th Cir. 1955).

66. 426 F.2d 833, 840 (5th Cir. 1970).

67. United States v. O'Connor, 237 F.2d 466, 475 (2nd Cir. 1956).

rectness of the summary may be tested on cross-examination.[68] Moreover, and perhaps most important of all, the jury should be instructed that the summaries do not, of themselves, constitute evidence in the case but only purport to summarize the documented and detailed evidence already admitted;[69] that the jury should examine the basis upon which the summaries rest and be satisfied that they accurately reflect other evidence in the case; and, if not so satisfied, the summaries should be disregarded.[70]

■ Having given concerned attention to the charts here involved, the evidence they purport to cover, and the court's instruction,[71] we find neither abuse of discretion by the court, nor prejudice to the appellants. Although the charts did accurately and fairly summarize the evidence, they were not offered as independent evidence[72] but were simply used as an aid in understanding testimony already introduced in the case or documents which were available.[73] Moreover, the court gave clear and positive instructions concerning the use of the charts. Finally, appellants' counsel extensively cross-examined FBI Agent Brady who prepared the charts,[74] and all documents relating to each transaction summarized in the charts were available for verification.

The evidence in this case is complex, intricate and labyrinthine in nature. The conduct of the appellants was designed to conceal their acts and purposes. The charts not only served a useful and legitimate purpose in the court below but they have been valuable to this court in our review of the evidence. Accordingly, this court finds no reversible error in the use made of the charts in question.

■ Appellants assign one additional error concerning the charts. Shortly after commencing deliberation the jury requested that the charts be sent to the jury room for their consideration. However, when counsel for the defense objected to their use on the ground that the charts had not been admitted in evidence, the court recalled the jury and stated:

> The Court has received your request for the copies of the charts prepared by the FBI. The Court would like very much to comply with your request, but it is unable to do it for reasons that may, perhaps, appear technical, but, nevertheless, a very important reason. These charts were used by

---

68. Cooper v. United States, 91 F.2d 195, 198 (5th Cir. 1937).

69. Ping v. United States, 407 F.2d 157, 160 (8th Cir.), cert. denied, 395 U.S. 926, 89 S.Ct. 1784, 23 L.Ed.2d 244 (1969).

70. Conford v. United States, 336 F.2d 285, 288 (10th Cir. 1964).

71. The court:
They are helpful summaries of what is in evidence, but they are not evidence in themselves. They are here to help the jury to the extent to which the jury considers them helpful and for no other purpose.

72. It appears to be well settled that they could have been properly admitted. See Bruce v. United States, 351 F.2d 318, 322 (5th Cir. 1965) cert. denied 384 U.S. 921, 86 S.Ct. 1370, 16 L.Ed.2d 441.

73. Contrary to the appellants' argument that the charts usurped the function of the jury, the Supreme Court stated in United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943):
No issue was withdrawn from the jury. The correctness or credibility of no materials underlying the expert's answers was [not] even remotely foreclosed by the expert's testimony or withdrawn from proper determination by the jury * * * The worth of our jury system is constantly and properly extolled, but an argument such as that we are rejecting (i. e. allowing an expert to summarize prior testimony and exhibits before the court constitutes a violation of the jury's factfinding province) tacitly assumes that juries are too stupid to see the drift of evidence. Id. at 519, 63 S.Ct. at 1241.

74. In fact, appellants utilized the chart extensively in attempting to show their theory of the case.

the witness, Mr. Brady, to illustrate his testimony. They were marked for identification, but they were not offered in evidence. They were not an exhibit in evidence. Under the law, I cannot furnish anything to the Jury that has not been admitted in evidence unless all counsel unanimously consent and all counsel do not unanimously consent. I regret, therefore, that I am unable to comply with your request.

Appellants insist that these remarks were extremely prejudicial. They argue that it was obvious to the jury that defense counsel were the ones who did not consent since the charts had been prepared and used by the Government. Although we think the better practice for the court would have been to rule on the request without comment, judges are not prohibited from stating the reasons for their rulings and this did not constitute reversible error.[75]

## VII

### Motion for Severance

Appellant Fanning insists that the district judge erred in failing to grant his motion for severance. The motion was predicated upon the fact that Fanning was not indicted under the seven substantive counts of the indictment, but only under the one conspiracy count. He, therefore, argued that he would be prejudiced in his defense because the jury would be unable to sift the complex evidence to determine with accuracy his involvement in the conspiracy.

Under Rule 8(b) of the Federal Rules of Criminal Procedure joinder of defendants is appropriate where, as here, the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." There is no doubt here that the substantive counts and the conspiracy counts are of similar character since the charge is a single conspiracy contemplating a single end.[76] Thus the initial joinder of Fanning with the defendants are permissible under Fed.R.Crim.P. 8 (b). In addition the rule permits defendants to be charged in one or more counts, together or separately, and all of the defendants need not be charged in each count.[77] Thus, a conspiracy count may be joined with the substantive offenses which are its objects,[78] especially where, as here, the evidence relied upon to establish the conspiracy will embrace the substantive counts of the indictment.[79]

Appellant Fanning further contends that the trial judge erred in denying his Motion for Relief from Prejudicial Joinder pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 states in relevant part that:

> If it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, or grant a severance of defendants or provide whatever other relief justice requires.

Since the decision to grant a severance is committed to the sound discretion of

---

75. Cf. Fountain v. United States, 384 F.2d 624, 632 n. 9 (5th Cir. 1967).

76. See: Blumenthal v. United States, 332 U.S. 539, 556, 558, 68 S.Ct. 248, 92 L. Ed. 154 (1947); James v. United States, 416 F.2d 467, 474 (5th Cir. 1969); Tillman v. United States, 406 F.2d 930, 934 (5th Cir. 1969).

77. Rule 8(b) specifically states that "all of the defendants need not be charged in each count."

78. James v. United States, 416 F.2d 467, 474 (5th Cir. 1969); Chadwick v. United States, 117 F.2d 902, 904 (5th Cir. 1941) cert. den. 313 U.S. 585, 61 S.Ct. 1109, 85 L.Ed. 1541; United States v. Bentvena, 193 F.Supp. 485, 491 (S.D. N.Y.1960).

79. United States v. Kahn, 381 F.2d 824, 838 .(7th Cir. 1967); United States v. Nomura Trading Co., 213 F.Supp. 704, 706 (S.D.N.Y.1963).

the trial judge,[80] his decision will not be overturned unless there is an affirmative showing of abuse of discretion.[81] In Tillman v. United States [82] we said:

> The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed on review * * * The defendant must show something more than the fact that 'a separate trial might offer him a better chance of acquittal.' [83]

To support his claim of prejudicial joinder, appellant Fanning alleges only that because of the length and complexity of the trial the jury was "totally incapable of performing its function of meticulously sifting the evidence as it applied against this Defendant [Fanning.]." We think this allegation is purely speculative and entirely unconvincing. Indeed, the trial judge used extreme care to afford each defendant a separate and impartial consideration of his case. Throughout the trial he carefully and clearly admonished the jury to consider the evidence only against the defendant to whom it related. Moreover, he expressly instructed the jury to:

> * * * consider the case of each defendant separately and apart from all other defendants, and you must consider the case of each defendant as to each separately as to each of the counts in which he is charged.

And finally, at the end of the trial he exercised care in giving instructions and in marshalling the evidence to aid the jury in their consideration of each defendant separately.

█ Based upon the totality of the circumstances and facts disclosed by the record, we are unable to find that Fanning has shown a clear likelihood of confusion on the part of the jury to his prejudice. Our independent examination of the entire trial proceedings supports our conclusion that no prejudicial error was committed. Our conclusion is further buttressed by the fact the trial judge gave unequivocal instructions to the jury to consider the guilt of each defendant separately based upon evidence applicable only to him. We hold that the trial court did not abuse its discretion in denying a severance.

## VIII

### *The Charge*

█ Appellants emphasize the fact that the trial judge devoted twenty pages of his closing instructions to a summarization and discussion of the evidence. They contend that the court was "manifestly partial" to the Government's case in his outline of the evidence, and in effect, presented the prosecution's final argument. We reject this contention. The trial judge did not, in the slightest degree, overstep the bounds of the rule that preserves to trial judges in the federal system the right to comment on the evidence. As this court stated in Kyle v. United States: [84]

> In charging the jury the trial judge is not limited to instructions of an abstract nature. It is within his province, whenever he thinks it necessary, to endeavor to assist the jury in arriving at a just conclusion to summarize and comment upon the evidence and express his opinion on the facts, provided it is made clear to the jury that the comments merely express views of the court which are not binding upon the jury and that the jury is free to determine facts according to their own judgment.

---

80. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Smith v. United States, 385 F.2d 34, 37 (5th Cir. 1967); Peterson v. United States, 344 F.2d 419, 422 (5th Cir. 1965).

81. Blachly v. United States, 380 F.2d 665, 674–675 (5th Cir. 1967).

82. 406 F.2d 930 (1969).

83. Id. at 935. See also: Williams v. United States, 416 F.2d 1064, 1069 (8th Cir. 1969).

84. 402 F.2d 443, 444 (5th Cir. 1968).

Consonant with this practice, the trial judge made it clear to the jury both before[85] and after[86] his summary of the evidence that they should rely solely on their own recollection rather than that of the court; that all matters of fact were submitted to their determination; and that conclusions upon such matters were to be reached by them completely free of any suggestion from the court. Considering the involved character of the evidence presented, we think it was necessary for the court to assist the jury by simplifying the evidence and clarifying the issues. The fact that the court's summary of the Government's case was more extensive than his statement of the appellants' contentions may be attributed to the fact that the Government's evidence was far more voluminous than that of the defense.[87] We find no error in the judge's marshalling of the evidence.

## IX

### Failure to Accord Gordon the Right of Allocution

Defendant Gordon alleges that he was not given the opportunity to be heard before sentence was imposed as required by F.R.Crim.P. 32(a) (1).[88] The record shows that at the time of sentencing the court turned to counsel for the defendant Gordon and stated: "Mr. Kaplan, the court will be glad to hear from you in behalf of Mr. Gordon." Thereafter the attorney made several statements to the court in behalf of Gordon and suggested that the court consider "any statement that Mr. Gordon himself will make to the court." The court then proceeded to pronounce sentence. Immediately after sentence Gordon inquired whether he would be allowed bond pending appeal. Apparently the court realized that he had neglected to "address the defendant personally" to inquire whether he wished to make a statement in his own behalf. The following then transpired:

"Now, Milton Gordon, do you wish to make a statement in your own behalf and to present any information in mitigation of punishment?

"MR. GORDON: In view of your Honor's sentencing, I see no point in it."

It is obvious that Rule 32(a) requires the court to allow both counsel for the

---

85. I shall now devote a few minutes, members of the jury, to take up each count of the Indictment separately, summarize what it charges, and call your attention to some of the evidence that has been introduced in connection with that count.

This may, perhaps, be helpful to you. I shall summarize and discuss the evidence only in a skeletonized fashion. I shall not attempt to summarize all the evidence that has been introduced but only those portions that appear to me to be relevant and important.

I want to remind you of what I said at the beginning of my remarks, that my summary discussion and comments on the facts and on the evidence are intended only to help you. They are not binding upon you. You need attach to them only such weight as you deem wise and proper. You must make your own decision on the facts and on the evidence * * * You are sovereign, so to speak, as to deciding the facts.

86. Again, I want to remind you, as I have already said a couple of times, that my discussion and summary of the evidence was intended only to help you and is not binding upon you. You are the sole judges

of the facts and you must reach your own conclusion on the facts on the basis of the entire evidence as you understand it to be.

87. See: United States v. Dockery, 417 F. 2d 330, 332 (4th Cir. 1969); United States v. Edwards, 366 F.2d 853, 868 (2d Cir. 1966); cert. den. Jakob v. United States, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782; United States v. Dardi, 330 F.2d 316, 330 (2d Cir. 1964), cert. den. 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed. 2d 50; United States v. Kahaner, 317 F.2d 459, 476 (2d Cir. 1963), cert. den. Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65. Cf. United States v. Dopf, 434 F.2d 205 (5 Cir. 1970).

88. Rule 32(a) (1) provides:
Sentence shall be imposed without unreasonable delay. Pending sentence the court may commit the defendant or continue or alter the bail. Before imposing sentence the court shall afford counsel an opportunity to speak on behalf of the defendant and shall address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment.

defendant and the defendant to make a statement, if they desire to do so before sentencing. This right has its origin in the common law right of allocution.[89] It is an important right preserved for each defendant personally, to present to the court his plea in mitigation of sentence or other appropriate matters. In the case at bar we are presented with a typical example in which there was neither total failure to comply with the rule nor strict compliance with its terms and provisions. The Supreme Court dealt with this rule in two recent cases, Green v. United States [90] and Hill v. United States.[91] The question was before this court in Cuozzo v. United States.[92] The Sixth Circuit considered the problem in United States v. Byars [93] soon after the decision in *Green*. A district court case, Hardy v. United States,[94] considered the common law right of allocution as preserved in Rule 32(a) (1), but it was decided prior to *Green* and *Hill*. A resolution of the problem requires a careful analysis of the above cited cases.

In *Green*, the defendant collaterally attacked the sentence imposed because the trial court had not complied with Rule 32(a) before imposing sentence. In that case, the record disclosed that in the presence of both defendant Green and his counsel, the trial judge asked generally, "Did you want to say something?" whereupon counsel responded at length to invoke the court's discretionary leniency. Immediately following counsel's statement, the court pronounced sentence. On appeal, Green argued that it was not sufficient to afford only counsel for the defendant the right to speak. Although there was no majority opinion in *Green*, the Court concluded that since the trial judge's overture was ambiguously directed, petitioner Green failed to meet his burden of showing that he had been denied the personal right guaranteed by the rule. However, the Court gave this admonition: in the future trial judges "should leave no room for doubt" that there has been full compliance with the rule and that the defendant was given a full opportunity to speak prior to sentencing.

In Hill v. United States,[95] the defendant invoked Rule 35 of the F.R.Crim.P. to vacate a sentence as "illegal" on the ground that the trial judge failed to accord him the right to make a statement before sentencing. There the Court observed that Rule 32(a) demands that every convicted defendant be given an opportunity personally to speak in his own behalf before sentencing. Nevertheless, a majority of the Court refused to grant relief concluding that the failure of a court to ask a defendant whether he had anything to say before sentence was imposed was not itself an error "of the character or magnitude cognizable under a writ of habeas corpus.[96] It held that since the error was neither jurisdictional nor constitutional, it did not constitute such a fundamental defect as to amount to either a complete miscarriage of justice or a fundamental violation of fair procedure. Moreover, the Court concluded that such failure did not constitute "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is appar-

---

89. "The design of Rule 32(a) did not begin with its promulgation; its legal provenance was the common law right of allocution. As early as 1689, it was recognized that the court's failure to ask the defendant if he had anything to say before sentencing was imposed required reversal. See Anonymous, 3 Mod 265, 266, 87 Eng.Rep. 175 (KB)." Green v. United States, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961).

90. 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961).

91. 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962).

92. 325 F.2d 274 (5th Cir. 1963).

93. 290 F.2d 515 (6th Cir. 1961).

94. 159 F.Supp. 208 (S.D.N.Y.1957).

95. 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962).

96. Id. at 428, 82 S.Ct. at 471.

ent." [97] In our view it is significant that the Court emphasized the fact that Hill was not "affirmatively denied an opportunity to speak *during the hearing* at which his sentence was imposed." [98] It was further observed that the record did not suggest that the district judge was either misinformed or uninformed as to any relevant circumstances or that the defendant would have had anything to say if he had been formally invited to speak.

In Cuozzo v. United States [99] the defendant was not given an opportunity to speak during the hearing at which his sentence was imposed. In United States v. Byars [100] the district judge permitted counsel for the defendant to make an extended statement, but no inquiry was made directly of the defendant to ascertain whether he wished to make a statement in his own behalf before sentence was imposed. On appeal, both cases were remanded to the district court for resentencing after addressing each defendant personally and affording him the opportunity to present his plea in mitigation of the punishment and to make a statement in his own behalf.

While the defendants in *Cuozzo* and *Byars* were given no opportunity to speak, defendant Gordon by contrast, was given an opportunity to speak in his own behalf by a clear invitation from the bench. Sentence had been pronounced, but the proceedings had not been finally concluded. In this situation it seems reasonable to assume that any statement which Gordon might have made (in mitigation of his punishment) the moment before sentencing would have been equally as effective the moment after pronouncement of sentence. Influencing our decision in this regard is the record disclosure that Gordon, himself a lawyer, did not feel a total restraint on his right to speak during the sentencing; at the hearing he inquired whether he would be granted release pending appeal.

 If we were to hold that the sentencing procedure was fatally improper, no greater opportunity could be afforded Gordon to speak than he has already been given since our established procedure would only require a remand of the case for resentencing.[101] With this resolution in mind we are impressed by the language in Hardy v. United States [102] wherein the district court stated:

> Defendant also alleges he was not given the opportunity to be heard before sentence was imposed. However, the record shows that defendant immediately thereafter was given the opportunity to speak, and indeed did so. Defendant was still in the presence of and under the control of the Judge and clearly had not commenced to serve his term of imprisonment. The sentence could have been changed. [citation omitted]. Having been heard, defendant cannot now rely upon Rule 32(a) of the Rules of Criminal Procedure in alleging he was not heard before the imposition of the sentence.[103]

While we do not approve the procedure followed by the trial court in this instance and strongly urge district courts to literally comply with the requirements of Rule 32(a) (1),[104] we do not believe that the failure to comply with the formal provision of the rule requires us to remand the case for resentencing in literal compliance with it.

97. Id. at 428, 82 S.Ct. at 471.

98. Id. at 429, 82 S.Ct. at 472 (emphasis added).

99. 325 F.2d 274 (5th Cir. 1963).

100. 290 F.2d 515 (6th Cir. 1961).

101. See: Cuozzo v. United States, 325 F. 2d 274 (5th Cir. 1963).

102. 159 F.Supp. 208 (S.D.N.Y.1957), affd. 252 F.2d 780 (2d Cir. 1958), cert. den. 356 U.S. 944, 78 S.Ct. 791, 2 L.Ed.2d 819.

103. Id. at 212.

104. In Green v. United States, 365 U.S. 301 at 305, 81 S.Ct. 653 at 655, the Court emphasized that:
> Trial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant. Hereafter trial judges should leave no room for doubt that the defendant had been issued a personal invitation to speak prior to sentencing.

## X

### Insanity Issue

Levenson's principal defense was a claim of insanity at the time of the alleged transactions here involved. He contends on appeal that he introduced evidence tending to prove his insanity and that the trial court erred in refusing to submit the issue of insanity vel non to the jury as requested.

In Blake v. United States [105] we adopted the A.L.I. "substantiality test" for determining insanity,[106] and held that where there is some evidence supporting a claim of insanity, the issue must be submitted to the jury. In adopting the A.L.I. formula for determining this issue, we were convinced that the "substantiality test" was called for in light of current medical knowledge that mental capacity is not an absolute quality, but a matter of degree.[107] Whereas in the past the law demanded a conclusion that a man was either sane and therefore responsible or insane and not responsible at all,[108] the standard promulgated by the A.L.I. and espoused by *Blake* recognized the wide range of mental disorders as well as the vagaries of psychiatric classi-

fication.[109] In addition, we observed in *Blake* that criminal law is not concerned with esoteric classifications but with the fundamental issue of criminal responsibility.[110]

In resolving the complex issue of criminal responsibility it is of critical importance that the defendant's entire relevant symptomatology be brought before the jury and explained. We have adopted the concept that courts should favor the reception of evidence bearing on the issue of insanity vel non. Such a task dictates and defines the significant role to be played by the psychiatrist as an expert witness. In the first place, he is needed to assimilate, correlate, and present in meaningful terms all relevant psychological and other scientific considerations so that the jury may decide whether a mental disease or defect existed at any critical time, and, if so, whether it was sufficient to negate criminal responsibility.[111] In the second place, the psychiatrist is specially trained and therefore best equipped to evaluate information from all the available sources, to discard worthless data, and to give the fullest picture, which includes his professional opinion, of the defendant's

---

105. 407 F.2d 908, 909, 911 (5th Cir. 1969).

106. Section 4.01 of the A.L.I. Model Penal Code as adopted in *Blake* is as follows:
(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

107. Blake v. United States, 407 F.2d 908, 909, 914–915 (5th Cir. 1969).

108. Davis v. United States, 160 U.S. 469, 483, 16 S.Ct. 353, 40 L.Ed. 499 (1895). See: Comment, 44 Tul.L.Rev. 192, 200 (1970); Comment, Loyola L.R. 210, 211 (1970).

109. " * * * One does not have to echo the scepticism uttered by Brean, C. J., in the fifteenth century, that 'the devil

himself knoweth not the mind of men' to appreciate how vast a darkness still envelops man's understanding of man's minds. Sanity and insanity are concepts of incertitude. They are given varying and conflicting content at the same time and from time to time by specialists in the field." Leland v. State of Oregon, 343 U.S. 790, 803, 72 S.Ct. 1002, 1009, 96 L.Ed. 1302 (Mr. Justice Frankfurter dissenting). See: Mims v. United States, 375 F.2d 135, 141, 142 (5th Cir. 1967).

110. See: Blake v. United States, 407 F.2d 908, 913–916 (5th Cir. 1969); Mims v. United States, 375 F.2d 135, 142–143 (5th Cir. 1967); United States v. Currens, 290 F.2d 751, 763 (3d Cir. 1961).

111. United States v. Currens, 290 F.2d 751, 772 (3d Cir. 1961); Blocker v. United States, 116 U.S.App.D.C. 78, 320 F.2d 800, 801 (1963); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 849 (1962); Comment, 44 Tul.L.Rev. at 201 (1967).

total personality.[112] Of course, the presumption of sanity remains until the defendant introduces "some evidence" of insanity; but at that point the prosecution must prove to the jury beyond a reasonable doubt that the defendant had the substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the law he is alleged to have violated. In each case which raises the issue of insanity, therefore, all pertinent evidence on that issue should be presented to the jury so that criminal responsibility will be determined from all the pertinent evidence.

During the trial appellant Levenson offered only one practicing psychiatrist, Dr. Michael Gilbert, to testify on the issue of Levenson's sanity.[113] A close friend and social acquaintance, Dr. Gilbert examined Levenson in April 1962, two full years before the commencement of the alleged criminal transactions involved in this trial. At that time Levenson had received a serious head injury in an automobile accident. When Dr. Gilbert examined Levenson soon after the accident, he discovered that Levenson's pupils were dilated, that his reflexes were erratic, and that he had an abnormal electroencephalograph. Concluding from these symptoms that Levenson had sustained severe brain contusions, Dr. Gilbert ordered a number of psychological tests to determine whether Levenson's injuries had damaged his brain. These tests indicated that Levenson had suffered residual brain damage which impaired his ability to recall recent events. Dr. Gilbert also testified that as a result of the memory impairment Levenson, a prominent trial lawyer, was unable to continue practicing law, and as a consequence developed serious psychological and emotional problems. Levenson was referred to other physicians for reasons that are not material here.

Dr. Gilbert did not examine him on a professional basis from April 1962 until the trial in 1966, although he occasionally saw him on a social basis. Nevertheless at the conclusion of his testimony, Dr. Gilbert was asked the following questions without objection:

Q. Doctor, do you have an opinion, based upon a reasonable medical certainty, as to whether or not Mr. Levenson was able between June 1, 1964, and January 11, 1966 to fully understand and remember the complex transactions in the indictment?

A. Yes, I do.

Q. What is that opinion, sir?

A. I feel that he couldn't.

In rebuttal the Government offered no testimony, lay or expert, regarding Levenson's sanity; instead it moved to strike Dr. Gilbert's testimony on the ground that it was not relevant to the question of legal sanity. In support of the Government's motion to strike it was contended that the testimony was not appropriate for jury consideration. In the words of the United States Attorney, the opinion given by Dr. Gilbert was "not a test of insanity." In denying the motion the court ruled that the issue of insanity should be submitted to the jury and commented as follows:

I don't think it is either, but that is no basis for striking the testimony. I think that it can be made a proper subject matter of instruction to the jury.

Notwithstanding this comment the trial judge refused to give charges requested by Levenson on the issue of insanity and made no mention of the question during

112. It should be noted that the jury is no more bound by psychiatric testimony than other expert opinion or other legitimate evidence on the sanity issue, and is free to attach to it whatever credibility it decides. For an exhaustive list of cases on this point see Mims v. United States, 375 F.2d 135, 140 n. 2 (5th Cir. 1967).

113. An extensive pre trial hearing was held to determine whether Levenson was mentally competent to stand trial. At this hearing the testimony of two psychiatrists, two clinical psychologists and several lay witnesses was introduced.

his oral instruction to the jury.[114] On sentencing Levenson, however, the trial judge did make the following observation:

The Court is taking * * * into account * * * the facts that were brought out in the evidence that due to a serious automobile accident he sustained brain damage, as well as other physical injuries, and at the time involved in this case, he might have been suffering from the residuals of those injuries.

Because *Blake*[115] dictates that if there is some evidence supporting the claim of insanity the issue must be submitted to the jury, we are convinced by our examination of the evidence that the issue of sanity was sufficiently raised by the testimony of Dr. Gilbert to require its submission to the jury under the guidance of proper instructions. The trial court was correct in assuming that it was the court's duty to decide the threshold question whether the evidence of insanity was sufficient to present a jury issue. Nevertheless, in making such determination the court apparently relied upon the then existing Fifth Circuit presumption which precluded jury consideration of the issue of insanity until the evidence was sufficient to raise a reasonable doubt of the defendant's mental capacity to commit the alleged crime.[116] Subsequent to the trial, but while this case was on appeal we decided the *Blake* case and held that it was to apply to all cases pending on appeal.[117] In *Blake* we did not attempt to formulate a precise quantitative measure by which to determine how much evidence is sufficient to raise the issue of insanity. We did say, however, that only slight evidence was necessary.[118] Since the trial court measured the sufficiency of the evidence by a standard not consistent with *Blake*, Levenson's conviction must be reversed.[119]

Aside from the insanity issue we have no doubt whatever that the evidence introduced was clearly sufficient to sustain the jury's verdict of guilty as to Levenson. We are also mindful of the fact that Dr. Gilbert's testimony was the only evidence presented by Levenson at the trial on the merits to establish his plea of insanity. Although Dr. Gilbert appears to be well qualified, his expert opinion is subject to serious question in view of the factual background upon

114. From the record it is unclear why the court refused Levenson's requested charges No. 2 and No. 3. Both were directed to the question of insanity.

115. 407 F.2d 908 (5th Cir. 1969).

116. In ruling on a motion for acquittal by Levenson's attorney, the court said:
I am going to deny the motion. It is a fact, of course * * * it is the law rather, as formulated by the Supreme Court in the *Davis* case, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750, that once some evidence is introduced raising a reasonable doubt as to the mental capacity of the defendant to commit the crime as of the time that the criminal act was committed, the burden is on the Government to prove mental capacity beyond a reasonable doubt.

When there is no proof raising such a reasonable doubt or there is nothing in the case raising it, then the Government may proceed on the presumption of sanity; but this rule has to be analyzed a little farther.
There must be some basis for a reasonable doubt as to mental capacity to commit the offense before the Government is placed under such a burden.

117. Blake v. United States, 407 F.2d 908, 916 (5th Cir. 1969).

118. Id. at 911. See also: United States v. Tsoi Kwan Sang, 416 F.2d 306, 308 (5th Cir. 1969); Davis v. United States, 413 F.2d 1226, 1228 (5th Cir. 1969); Nagell v. United States, 392 F.2d 934, 937 (5th Cir. 1968); Brock v United States, 387 F.2d 254, 257 (5th Cir. 1967); Evalt v. United States, 382 F.2d 424, 428 (9th Cir. 1967); Doyle v. United States, 366 F.2d 394, 401 (9th Cir. 1966); Hall v. United States, 295 F.2d 26, 28 (4th Cir. 1961); Howard v. United States, 232 F.2d 274, 276 (5th Cir. 1956).

119. Davis v. United States, 413 F.2d 1226, 1228 (5th Cir. 1969).

which it is based. Nevertheless, we cannot escape the conclusion that it is the province of the jury to pass upon his credibility and to decide what weight should be given to his opinion.[120] Accordingly, we reverse the judgment of conviction and remand Levenson's case for a new trial.

## XI

### Conclusion

We have discussed in detail the principal issues urged for reversal. The appellants have raised a number of other less important questions. We have carefully considered all questions and issues raised, even though not discussed in detail in this opinion, and conclude that they are without merit.

Consistent with this opinion, we reverse the judgment of conviction of appellant Levenson and remand his case for a new trial because of the error committed with respect to the issue of insanity. In all other respects we affirm the judgments of conviction.

ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC

PER CURIAM:

The petitioner Marve A. Dubin is granted permission to file an out-of-time petition for rehearing. The petitions of Joseph H. Dixon, William Crandall, William Fanning, Martin D. Von Zamft, Milton Gordon, William Marmorstein and Marve A. Dubin are hereby denied separately and severally and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the petitions for rehearing en banc filed by Milton Gordon and William Marmorstein are denied.

120. Id. at 1228. Mims v United States, 375 F.2d 135, 140 (5th Cir. 1967); Nagell v. United States, 392 F.2d 934, 937 (5th Cir. 1968); Brown v. United States, 351 F.2d 473, 474 (5th Cir. 1965).