**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**David Ivan GOODMAN, a/k/a Charles Riccardi and David Lash, and Paul Alexander West, Defendants-Appellants.**

**No. 78-5443.**

United States Court of Appeals,
Fifth Circuit. .

Nov. 1, 1979.

Paul Alexander West, pro se.

Percy Foreman, Mike DeGeurin, Houston, Tex., for West.

William A. Bratton, III, Dallas, Tex., for Goodman.

D. Mark Elliston, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, SKEL-TON, Senior Judge,* and RUBIN, Circuit Judge.

SKELTON, Senior Judge.

The Appellants, David Ivan Goodman and Paul Alexander West, were indicted in three counts for conspiring to manufacture, distribute and possess with intent to distribute a controlled substance, methaqualone (Count 1); manufacturing methaqualone (Count 2); and possessing with intent to distribute methaqualone (Count 3), all being violations of 21 U.S.C.A., §§ 846 and 841(a)(1).[1]

Following a jury trial in the United States District Court for the Northern District of Texas, Dallas Division, the Appellants were found guilty on each of the three counts and were sentenced to five years imprisonment with a special parole term of two years and a fifteen thousand dollar fine on each of the three counts, all sentences to run consecutively.[2] The Appellants have appealed their conviction to this court. We affirm.

## I. THE FACTS

The evidence adduced at trial showed that Appellant West and Herbert Goodman decided as early as December, 1975 to go into business together to "make a lot of money." The business was the making of methaqualone, a sedative, hypnotic depressant which is used as a replacement for barbiturates. This business venture became the largest operating clandestine drug laboratory seized in the history of the United States with a potential output of fourteen million methaqualone tablets, with street values ranging from one dollar and seventy-five cents to two dollars and ninety-five cents per tablet. The laboratory was capable of producing four hundred thousand tablets in a twenty-four hour period.

The idea of manufacturing methaqualone originated with Herbert Goodman, although Appellant West claimed to have done as much in the beginning as did Herbert Goodman. Appellant Goodman, Herbert Goodman's brother, came into the the operation around May of 1976. Then Deborah Carrier joined in the process of making methaqualone tablets around June of 1976 after be-

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. 21 U.S.C.A., § 846 provides, in pertinent part, as follows:

   "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both . . ."

   21 U.S.C.A., § 841(a)(1) provides as follows:
   "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; . . ."

2. Two other defendants, Herbert Edward Goodman and Deborah Carrier, were charged in the four count indictment. Deborah Carrier agreed to plead guilty to Count 4 of the indictment and cooperate with the United States Government in return for the dismissal of Counts 1, 2, and 3. Before the jury trial concluded, Herbert Goodman committed suicide. The Appellants were not named in Count 4.

ing earlier persuaded to do so by Herbert Goodman.

Herbert Goodman, Appellant Goodman, and Appellant West originally made the methaqualone in Houston at different addresses at various times. Herbert Goodman planned for a bigger operation in Dallas, and, consequently, Herbert Goodman, Appellants Goodman and West, and Deborah Carrier discussed the equipment needed and plans for moving the laboratory to Dallas. All four engaged in many conversations with each other regarding the making of methaqualone.

Appellant Goodman, with the assistance of Appellant West, constructed the interior of the new laboratory; Herbert Goodman ran the tablet punch machine; and Appellant West "cooked" and distributed the tablets. (The tablets were "placed in barrels with fake bottoms, and something else on top of them." They were then supplied to various other distributors.) Deborah Carrier made an answering service tape for the new laboratory, bought labels for barrels used, helped purchase a large mixer for the laboratory, and assisted in the move to Dallas by finding places to live.

Herbert Goodman and the Appellants split their profits equally among themselves. They paid Deborah Carrier a lump sum of either eighty-five thousand or one hundred thousand dollars as her share. A portion of the money made went into a slush fund to be used either in the event of arrest or to buy more equipment.

Herbert Goodman and the Appellants sometimes worked at the laboratory for two months at a time, and then they would quit for a period of a week to a month. Appellant Goodman did nothing else during this time except make methaqualone. When they did work they worked on a daily basis.

Investigation of this offense began with a telephone call from Forest Squire, director of security at the Sherwin-Williams Company, to George Krebs, compliance investigator with the Drug Enforcement Administration (DEA). Mr. Squire, as a part of his duties, routinely informed the DEA of the sale of N-acetylanthranilic acid which is a necessary substance in the manufacture of methaqualone. Pursuant to his duties, Mr. Squire advised Mr. Krebs of company records reflecting several shipments of N-acetylanthranilic acid to Cougar Construction Company and International Chemical Testing Laboratory at various addresses in Houston and reflecting business dealings with Herbert Goodman and Appellant Goodman. After the initial telephone contact, Mr. Squire further determined that Sherwin-Williams had shipped seventy-three hundred pounds of N-acetylanthranilic acid to Cougar Construction and International Chemical.

On January 25, 1977, Mr. Krebs told George Shepard, a special agent with the Drug Enforcement Administration in Houston, that Sherwin-Williams had an existing order for twenty-five hundred pounds of N-acetylanthranilic acid from International Chemical Testing Laboratory. Mr. Krebs and agent Shepard arranged for a controlled delivery of the chemical to the Houston company. Agent Shepard, in an undercover capacity, then delivered the twenty-five hundred pounds of N-acetylanthranilic acid to International Chemical Testing Lab on Jessamine Street in Houston. Once there, Shepard met "Charles Riccardi" whom he later identified as Herbert Goodman. Herbert Goodman signed the delivery ticket for the chemical and then drove away from the Jessamine address in a car registered to Appellant Goodman's wife.

George Shepard next initiated a twenty-four hour surveillance for a two-week period on the Jessamine address and observed Herbert Goodman and Appellant West go in and out of the laboratory during that time. Also, during this time, agent Shepard contacted several companies to determine whether they had shipped chemicals and equipment to International Chemical Testing Laboratory and Cougar Construction Company. This part of the investigation subsequently uncovered numerous business dealings involving sales of chemicals and equipment, eventually seized by the DEA, to International Chemical Testing Laboratory, Cougar Construction Company, Envi-

ronmental Testing Laboratory (all of these were business fronts used by the Appellants in the methaqualone operation), and to Herbert Goodman and Appellant Goodman in both their real names and aliases (i. e., Charles Riccardi, Dave Riccardi, Herb Lash, David Lash, etc.). Environmental Testing Laboratory was the name used by the Appellants for their laboratory on Farrington Street in Dallas, Texas.

Having discovered the Dallas laboratory, agent Shepard contacted Russel Pfeiffer, special agent with the DEA in Dallas, and requested his assistance. Agents Pfeiffer and Shepard arranged to make a controlled delivery of equipment to the Dallas laboratory on Farrington Street. When agent Pfeiffer delivered the equipment to the Farrington address on February 14, 1977, Herbert Goodman, Appellant Goodman, and Appellant West were present. Appellant West helped agent Pfeiffer unload the truck, and Appellant Goodman signed the receipt for the equipment. The next day, Appellant Goodman was again present at the Farrington Street laboratory.

On February 16, 1977, Appellant West rented a Hertz truck and he and Herbert Goodman were observed loading the truck with N-acetylanthranilic acid at the Jessamine Street laboratory in Houston. Appellant West, followed by agent Shepard, drove the truck to the Farrington Street address in Dallas where he and Herbert Goodman unloaded the N-acetylanthranilic acid.

Surveillance on the Farrington Street address disclosed that from February 22, 1977, to July 27, 1977, Herbert Goodman was at the Farrington Street laboratory on at least six different dates. Appellant Goodman was there on at least five different dates, and Appellant West was there on at least three different dates. Photographs depicted Herbert Goodman and Appellant West at the Farrington address on February 22, 1977, and depicted Herbert Goodman and Appellant Goodman there on May 23, 1977.

On May 9, 1977, Wayne Joyce, a Dallas engraver, revealed to the DEA that he had been working on tablet punches for Herbert

and David Lash since August or September of 1976. Mr. Joyce maintained that he had several dealings in this regard with Herbert and David Lash, whom he later identified as Herbert Goodman and Appellant Goodman. Mr. Joyce gave agent Pfeiffer a tablet punch which he had made for Herbert Goodman and Appellant Goodman in August of 1976 and which Herbert Goodman had returned in April of 1977. Agent Pfeiffer gave this punch to Dr. Edward Franzosa who made duplicast molds of this punch and eventually made placebos (i. e., sample tablets that will show exterior characteristics of a tablet) from several other punches that either Herbert Goodman and Appellant Goodman had ordered or were seized from the Farrington Street laboratory in August of 1977.

Dr. Franzosa, using the process of ballistics analysis, compared the duplicast molds and the placebos with his reference collection at the Special Testing Laboratory. Based upon this comparison, Dr. Franzosa concluded that the punch given to agent Pfeiffer and punches recovered from the Farrington Street laboratory were used to make over forty-eight thousand methaqualone tablets seized by the DEA in New York, Colorado, and Texas from a period of November of 1976 to April of 1977.

The DEA waited until August 18, 1977, to seize the Farrington Street laboratory in hopes that they would discover financial backers and others involved in the operation. When the laboratory was seized, DEA recovered numerous pieces of equipment and large amounts of chemicals used to make methaqualone tablets. Agents also found approximately one hundred pounds of methaqualone on the premises. As a result of their investigation, DEA subsequently arrested Herbert Goodman, the Appellants, and Deborah Carrier.

II. THE ISSUES

The Appellants assert seven points of error as follows: (1) the trial court denied Appellants the right to confront witnesses by admitting certain out-of-court statements into evidence during the testimony of Deborah Carrier, Theresa Hildreth and

Donald Bird; (2) the trial court denied Appellants the right to confront witnesses by limiting the cross examination of Deborah Carrier and George Shepard; (3) the trial court erred in not granting a mistrial and examining the jurors following the suicide of Herbert Goodman; (4) the trial court erred in imposing consecutive sentences for Counts 2 and 3; (5) the trial court erred in denying Appellants' Motion to Dismiss Count Three of the indictment for failure to charge an offense defined by law; (6) the convictions under Count Two were without support in the verdict because the verdict failed to require the jury to find that "quantities" of methaqualone were manufactured as alleged in the indictment; and (7) methaqualone has never validly been made a Schedule II controlled substance.

## III. CONFRONTATION OF WITNESSES

The Appellants contend that the trial court erred in admitting the following evidence: Deborah Carrier's testimony relating to what Herbert Goodman told her about the methaqualone operation which implicated the Appellants; Theresa Hildreth's testimony regarding what Appellant West told her about the methaqualone oper-

ation which implicated Appellant Goodman; and Donald Bird's testimony concerning what Appellant West and Herbert Goodman told him about the methaqualone operation which implicated Appellants Goodman and West. Appellants contend that the admission of this testimony denied them their Sixth Amendment rights to confront witnesses under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *United States v. Holt*, 483 F.2d 76 (5 Cir. 1973). Consideration of the evidence of these witnesses follows:

### A. *Carrier's Testimony*

The testimony of Deborah Carrier of which the Appellants complain consisted of statements made by Herbert Goodman to her during several conversations with respect to the methaqualone operation and the Appellants respective involvements in it.[3]

In support of their contention that the admission of Ms. Carrier's testimony violated their right to confront witnesses, the Appellants rely primarily on *Bruton v. United States, supra.* In that case, Bruton and Evans were tried together for armed postal robbery. Evans' oral confession to a

---

**3.** Ms. Carrier testified, in pertinent part, as follows:

"Herbert Goodman told me that he, David and Paul . . . would order chemicals, and they would make them with a punch machine."

"He [Herbert Goodman] told me that he was making Quaas . . . he said that David and Paul. Dave had just—. . . David Goodman. David Goodman, Paul West, but David had just come into the operation."

"He [Herbert Goodman] said that David Goodman . . . was in charge—they were building a new laboratory, they Herbert and Paul and David."

"His [David Goodman's responsibility] was the constructing part. He was building all of the insides."

"The time was around August when we started talking about it [moving to Dallas], and the reason was because Paul West would go out to the clubs at night and talk, and Herbie and David didn't feel very sure of what he was saying."

"They [Herbert Goodman and David Goodman] were getting—he told me that they went to factories."

"He [Herbert Goodman] told me that he and David were looking through some pamphlets, and he and David had gone to some factories, and he and David were talking about a duster that dusted off the pills and I believe something to dry the powder with—I don't remember what they called it—and a grinder, and I think that's all. I am not sure."

"He [Herbert Goodman] told me that Paul had driven the pills down. They were placed in barrels with a fake bottom, and something else was on top of them—I don't know what it was—and they put them all in a truck, and I believe David either rode with him or followed him."

"Q. [by prosecutor]: Did Herb ever tell you how the money was split? A: Three ways."

postal inspector that he and Bruton had committed the robbery was admitted into evidence. The Supreme Court held that since Evans did not testify the admission of his confession violated Bruton's right to confront witnesses. That case is distinguished from the one before us because *Bruton v. United States, supra*, did not involve an exception to the hearsay rule. The court in *Bruton* recognized this point by saying:

"There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner [Bruton] is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." 391 U.S. at 128, n. 3, 88 S.Ct. at 1624 n. 3.

In the instant case, the Government contends that Herbert Goodman's statements to Ms. Carrier are admissible under the conspiracy evidentiary rule. This point will be discussed below. We point out also that here the statements were made in the course of, and in furtherance of, the conspiracy while the statements in *Bruton v. United States, supra*, was a confession made to a law enforcement officer made after the conspiracy was ended and clearly not in furtherance of it.

In the more recent Supreme Court case of *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Court was called on to decide if testimony admitted under a Georgia statute allowing admission of a conspirator's statement made during the course of the conspiracy against other conspirators violated the defendant's constitutional right of confrontation. The Georgia rule of evidence at issue there was broader than the conspiracy evidentiary rule used in federal courts.[4]

The court held that the defendant's constitutional right to confront witnesses was not violated by the admission of the coconspirator's statement. The court noted:

"From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard." 400 U.S. at 88, 91 S.Ct. at 219.

The Court also noted that the defendant cross-examined the witness as to whether the witness had actually heard the statement made. In other words, the defendant was able to question the reliability of the testimony even though the person who made the statement did not testify.

We now consider whether the testimony in question was properly admitted under a recognized rule of evidence.

■ The conspiracy evidentiary rule, which is now included in Rule 801 of the Federal Rules of Evidence, was originally established by court decisions as an exception to the hearsay rule. The Rules of Evidence, however, now no longer classify conspiratorial declarations as hearsay, on the theory that they are a species of admission by a party-opponent. Simply stated, Rule 801 of the Federal Rules of Evidence,[5] provides that statements made by a coconspirator are admissible against other coconspirators if they are made during and in the furtherance of the conspiracy. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

The Appellants contend that the statements made by Herbert Goodman to Ms. Carrier are not admissible under this rule of

---

4. The Georgia hearsay exception that was applied in that case permitted the introduction into evidence of out-of-court statements made during the concealment phase of the conspiracy. Such statements are not admissible in federal conspiracy trials merely because they were made during concealment. The federal criteria are set forth in Rule 801(d)(2)(E), the full text of which is provided in footnote 5, *infra*.

5. Fed.R.Evid., Rule 801(d)(2)(E):

A statement is not hearsay if the statement is offered against a party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

evidence. This contention is unfounded. The record shows that the statements were made during the course of the conspiracy., i. e., between the dates of December, 1975, and August, 1977. The obvious purpose of explaining the methaqualone operation to Ms. Carrier was to induce her to join it, which she later did, and to keep her abreast of its current status. The record shows that Ms. Carrier moved into an apartment with Herbert Goodman as his girlfriend and thereafter began assisting in the mathaqualone undertaking after he explained it to her. Clearly his explanation to Ms. Carrier was an act in furtherance of the conspiracy. See *United States v. Dorn*, 561 F.2d 1252 (7 Cir. 1977); *United States v. Halpin*, 374 F.2d 493 (7 Cir. 1967).[6]

■ We hold, therefore, that the testimony in question of Ms. Carrier's was properly admitted into evidence under Rule 801(d)(2)(E) of the Federal Rules of Evidence, *United States v. Celaya-Garcia*, 583 F.2d 210 (5 Cir. 1978); *United States v. Archbold-Newball*, 554 F.2d 665 (5 Cir. 1977), *cert. denied*, 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977), and did not violate the Appellant's constitutional right to confront witnesses. *Dutton v. Evans*, *supra*. [No issue is raised concerning the correctness of the procedure followed in determining the admissibility of the declarations. See *United States v. James*, 590 F.2d 575 (5 Cir. 1979)].

### B. *Hildreth's Testimony*

Theresa Hildreth testified as a government witness about statements made to her by Appellant West which implicated Appellant Goodman. She was the live-in girlfriend of Appellant West. Her testimony was of little consequence as compared to that of Ms. Carrier's.[7]

■ Appellant Goodman contends that the admission of Mrs. Hildreth's testimony which implicated him violates *Bruton v. United States, supra*, and *United States v. Holt, supra*.[8] We agree that, as to Appellant Goodman, these statements were not admissible under Rule 801. However, the evidence in question had little probative value, and, even if it could be said that the admission of Mrs. Hildreth's testimony implicating Appellant Goodman was error, it was harmless error in view of the fact that it was merely cumulative of all the other evidence showing Appellant Goodman's involvement in the methaqualone operation. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). We find it unnecessary to discuss Appellant Goodman's other arguments on this issue.

### C. *Bird's Testimony*

Donald Bird, an unindicted coconspirator, was a government witness. He was granted immunity in exchange for the testimony which he gave. During the course of the methaqualone operation, he was employed by the Houston Police Department. He testified about statements made to him by Appellant West and by Herbert Goodman which implicated both of the Appellants.[9]

A. And that Paul himself helped cook and cook and distribute, and David—I am not sure what David's exact role was."

---

6. The court in the *Dorn* case stated: "Conversations made by conspirators to prospective co-conspirators for membership purposes are acts in furtherance of the conspiracy." In that case, a coconspirator told his wife what was going on and who was involved in the scheme for the purpose of enlisting her in the enterprise. The court concluded that such statements were made in furtherance of the conspiracy.

7. Appellant Goodman only complained of one part of Mrs. Hildreth's testimony that implicated him as follows:

"Q. [Prosecutor]: Okay, what else did Paul tell you?

8. The record shows that Mrs. Hildreth testified as follows just after making the statement about which Appellant Goodman is complaining:

"Q. [Prosecutor]: Did Paul ever tell you anything about David's involvement?
A. No sir, I don't remember Paul telling me anything."

9. Statements made by Appellant West to Donald Bird were:

"Q. [Prosecutor]: And who did he [Appellant West] tell you was involved in making methaqualone with him?

■ The admission of Bird's testimony did not violate the Appellants' right to confront witnesses. The reasoning and the authorities in support of this conclusion are the same as those for the admission of Ms. Carrier's testimony, *supra*. The testimony was clearly admissible under the federal conspiracy evidentiary rule.

The purpose of Herbert Goodman's statements was, obviously, to induce Mr. Bird to join the mathaqualone operation. Appellant Goodman argues that the admission of Mr. Bird's testimony about statements made by Appellant West to him violated Appellant Goodman's constitutional right to confront witnesses, citing *Bruton v. United States, supra,* and *United States v. Holt, supra.* The *Holt* case involved the joint trial of James Holt and William Holt. Testimony from two witnesses was admitted regarding out-of-court statements made by James Holt which inculpated William Holt. Both Holts were represented by one lawyer who could not place James Holt on the stand to deny or explain the statements made without incriminating both defendants further, nor could he attack James Holt's veracity. The court held that the trial court erred in not granting the defendants' motion to sever, because the government's use of the out-of-court statements of James Holt, who did not take the stand and which tended to incriminate William Holt, constituted a violation of William Holt's right to confront witnesses.

Appellant Goodman contends that since he and Appellant West were represented by one lawyer at a joint trial in which Appellant West did not take the stand, the admission into evidence of the out-of-court statements made by Appellant West which incriminated Appellant Goodman denied Appellant Goodman of his right to confront witnesses under *United States v. Holt*, su-

pra. Again, we find Appellant Goodman's contention unfounded. The primary issue in the Holt case was the denial of a motion to sever. There is no such issue before us in this case. Therefore, we hold that Mr. Bird's testimony concerning statements made to him by Appellant West were properly admitted under Rule 801(d)(2)(E), and that such admission did not violate Appellant Goodman's right to confront witnesses under *United States v. Holt*, supra, and, for the further reasons, and based on the authorities previously stated, did not violate Appellant Goodman's right to confront witnesses under *Bruton v. United States*, supra.

### IV. LIMITATION OF CROSS–EXAMINATION

■ The Appellants claim that the trial court's limiting of their cross-examination of Deborah Carrier and George Shepard denied them their constitutional right to confront witnesses. During the cross-examination of Ms. Carrier, defense counsel for Appellants asked her if she had filed an income tax return for 1977, but was prevented from receiving an answer due to objections by the government's counsel and the sustaining of these objections by the trial court. The trial court reasoned that such a question was extraneous and irrelevant. Appellants argue that the trial court's sustaining of the objection to this question limited their right to cross-examine the witness for the purpose of showing she was biased in the event she was to receive favorable tax treatment from the government in exchange for her testimony. We cannot agree with the Appellants' argument. The record clearly shows that Appellant's defense counsel was able to develop before the jury if preferential tax treat-

A. Herb and David Goodman

Q. [Prosecutor]: Did he [Appellant West] tell you how the money was split?
A. Yes, sir.
Q. [Prosecutor]: How did he say?
A. Three-way split.
Q. [Prosecutor]: Between whom?
A. Dave, Herb and himself."

Statements made by Herbert Goodman to Bird were:
"Q. [Prosecutor]: What did he [Herbert Goodman] propose to you?
A. An offer to come to work with him and some other individuals.
Q. [Prosecutor]: Did he tell you who the other individuals were?
A. Paul and Dave."

ment was a part of Ms. Carrier's plea bargain agreement with the government and whether she understood that she would not have to pay income tax on all the money that she had received.[10] Therefore, we hold that the trial judge did not abuse his discretion in limiting the cross-examination of Ms. Carrier regarding the filing of her 1977 income tax return. The defense attorney showed her bias, if any, by the existence of the plea bargain agreement. It is obvious to us that "the substance of the desired impeaching information had already been presented to the jury." *United States v. Onori*, 535 F.2d 938, (5 Cir. 1976).

We hold that the trial court did not commit error by limiting the cross-examination under these facts. *Gordon v. United States*, 438 F.2d 858 (5 Cir. 1971), *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971).

The Appellants next contend that their cross-examination of George Shepard, a government agent, was improperly limited because the trial court would not allow their defense counsel to question Shepard regarding Overt Act No. 6 alleged in the indictment. Also, they argue that the cross-examination of Shepard regarding his Grand Jury testimony was effectively limited *because such testimony was not transcribed.* The fact that his Grand Jury testimony was not transcribed was not error, because at the time it was given such transcription was not required. See *United States v. Biondo*, 483 F.2d 635 (8 Cir. 1973), *cert. denied*, 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974). According to Appellants, their defense counsel attempted to show inconsistencies between Shepard's testimony at the trial and his statements to the Grand Jury. More specifically, Appellants' defense counsel was apparently attempting to show Shepard's misidentification of Herbert Goodman as David Goodman. This misidentification occurred during Shepard's testimony before the Grand Jury and, consequently, it became a part of Overt Act No. 6.[11]

Although the trial judge allowed Appellants' defense counsel to question Shepard concerning the event which formed the subject matter of Overt Act No. 6, he precluded defense counsel from referring specifically to Overt Act No. 6 by name because this overt act had been previously stricken by the trial judge. Appellants' defense counsel questioned Shepard at length concerning his Grand Jury testimony where he testified at least three times that the person whom he identified as David Goodman was really Herbert Goodman.[12]

■ It is obvious that Appellant's defense counsel was able to make his point regarding Shepard's misidentification be-

---

10. In this regard the evidence shows the following testimony of Ms. Carrier:
   "Q. All right. As to the income that you have made over the last two years, do you think that—is it your understanding that that plea bargain includes a moratorium or not filing an income tax claim against you for the money you have accumulated?
   A. No.
   Q. All right. You understand that you have to pay taxes on that?
   A. Uh-huh."

11. Overt Act No. 6 stated:
   "On or about February 1, 1977, David Ivan Goodman, using the name of Charles Riccardi, signed for the delivery of the anthranalic acid described in Overt Act No. 5 at 6020 Jessemine, Bay 109, Houston, Texas."

12. Shepard testified at the trial:
   "Q. As you were saying, Mr. Shepard, when you talked to Dave—Herbert Goodman, David Goodman, that was on the occasion of their arrest. From a voice identification you are able to say in court today without any doubt in your mind that it is Herbert Goodman who accepted the delivery of the anthranilic acid from you on the February—on the February 1st date, is that correct?
   A. After the arrest of the defendants I spent a considerable amount of time with them, talked to them, had a chance to look at their mannerisms, whatever, hear their voice, and it became very clear to me that it was positively Herbert at that time rather than David, as I thought.

   Q. All right. And you were wrong when you said it was David Goodman?
   A. Yes, I was.

   A. Okay. That's during the period that I became not certain that—of who they were and was leaning toward Herb and after that became definitely sure that it was him."

fore the jury even though he could not specifically refer to Overt Act No. 6 by name.

We hold, therefore, that the Appellants were neither prejudiced nor denied their right to cross-examine witnesses in this situation. *United States v. Onori, supra; Gordon v. United States, supra.*

### V. REFUSAL TO GRANT A MISTRIAL OR EXAMINE THE JURORS

We next consider the Appellant's argument that the trial court erred in refusing to grant a mistrial and examine the jurors to determine if any member of the jury had been exposed to news media coverage of Herbert Goodman's suicide. Herbert Goodman, who was a codefendant in the cause now before us, committed suicide on May 22, 1978, while the trial was in progress. His suicide was reported in the May 23, 1978, edition of the Dallas Morning News. It appeared in a news article entitled, "Drug Defendant Commits Suicide," which appeared in Section B., page 11 of the newspaper.[13]

On the day of the publication of the news article Appellants' defense counsel moved for a mistrial and requested the court to examine the jurors regarding their knowledge of the suicide. Both the motion and the request were denied. The records shows that the trial court instructed the jury no less than three time to consider only the evidence before them and not to consider any news media reports concerning the trial or any of the defendants.[14]

**13.** The article appeared as follows:

# Drug defendant commits suicide

Herbert E. Goodman, 51, one of three defendants on trial in Dallas on charges of manufacturing methaqualone, was found dead Monday at his Houston home, police said.

He was discovered about 8 a.m. in the front seat of an automobile in his garage by his attorney, Michael Walter, a spokesman for the Harris County medical examiner's office said.

Goodman's death, which resulted from carbon monoxide poisoning, was ruled a suicide, the spokesman said.

Goodman, his brother, David Ivan Goodman, and Paul Alexander West had been on trial three weeks in U.S. Dist. Judge Robert Porter's court.

They were charged with conspiring in the manufacture of methaqualone (Quaalude) through the operation of what authorities have called the biggest illegal drug laboratory in the nation.

Federal agents in August 1977 raided a large chemical laboratory at 2533 Farrington in the Trinity Industrial District here where the methaqualone allegedly was produced.

Earlier, Deborah Carrier, 27, of Dallas, the dead man's former girlfriend, pleaded guilty to the one count in the 4-count indictment that alleged cocaine possession. After entering her plea, she testified as a government witness.

The future of the trial, which was halted Monday, remained uncertain, although testimony tentatively was scheduled to resume Wednesday.

**14.** 1. On May 1, 1978, at the beginning of the trial the jury was given the following general instructions:

"You must not consider anything you may have read or heard about the case outside of the courtroom, whether before or during the trial."

2. On May 17, 1978, the jury was reminded to follow the instructions as follows:

"Please abide by the instructions, and you are excused at this time until 9:30 on Monday."

3. On May 22, 1978, the day the suicide occurred, the jury was given the following instruction:

"THE COURT: Good morning, ladies and gentlemen. I simply want to say this to you. It's going to be necessary for us to recess until 9:30 in the morning. I would not do it, except that I have no other choice at this point, and without going into detail at this point I will say that there has been a development in the case which necessitates a short recess. I considered a number of things, and I have concluded that I would give you an express instruction and then excuse you until 9:30, and the instruction is that, should you see anything in the newspapers or hear anything on the radio or television concerning this case, I instruct you specifically to turn off the television or radio and not to read what you see in the newspaper at this point for the reasons that I think you all understand that I explained before. The case is to be decided solely on the evidence you hear in the court and not to be influenced even in the slightest by anything you hear or read outside of the courtroom. So I am not trying to mystify you, but at this point I am unable to give you a full explanation, so I think if you will just have faith in my judgment this is the best thing to do, and at some point in time you will be fully informed, but in the meantime I think we have all of this time and effort of you and me and the lawyers and the people, the government, that we don't want to imperil in anywise, so I regret that we have to do this, but it is necessary, and I hope that it won't inconven-

■ The determination of whether publicity is so prejudicial as to require a mistrial or a jury poll is within the sound discretion of the trial court. *United States v. Williams*, 568 F.2d 464 (5 Cir. 1978); *Gordon v. United States, supra.* In *Gordon*, this court stated:

"It is for the trial judge to decide at the threshold whether news accounts are actually prejudicial; whether the jurors were probably exposed to the publicity; and whether jurors would be sufficiently influenced by bench instructions alone to disregard the publicity." 438 F.2d at 873.

■ The appellants contend that the trial court abused its discretion because of the alleged jury prejudice caused by the newspaper article about Herbert Goodman's suicide. As a general rule, every claim of jury prejudice caused by a newspaper article appearing during a jury trial "must turn on its [own] special facts." *Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959); *Williams v. United States, supra; Gordon v. United States, supra.* In determining whether the jury was prejudiced by newspaper articles, the trial court must consider many things such as those discussed by this court in *Gordon v. United States, supra*:

"In making his determination [of jury prejudice] the trial judge must consider such things as (1) the character or nature of the information published, some being more sensational or penetrating than others; (2) the time of the publication in relation to the trial; (3) the credibility of the source to which the information is attributable and (4) the pervasiveness of the publicity; that is, the extent of the audience reached by the media employed and the interest evoked." 438 F.2d at 873.

Applying these considerations to the instant case, we find that the news article of which Appellants complain was not inflammatory and did not refer to any former criminal record of the Appellants, as was the case in *Marshall v. United States, supra*, and *Williams v. United States, supra*. It was not published at a critical time during the trial (i. e., it was published at a time when the government was still presenting its case). The article was factual in nature and seemingly credible. The article was not "probative of guilt" as in *Williams v. United States, supra*.[15] The trial court repeatedly instructed the jury in the instant case not to read or listen to news media accounts of the trial. There was no showing that any juror read or even saw the article. This court relied heavily on this circumstance in *Gordon v. United States, supra*, stating:

ience you too much, because it shouldn't take us but a very little while to finish the case. So I will excuse you with those instructions, and please follow them, and you are excused at this time until 9:30 in the morning, and you are excused at this time."

4. On May 24, 1978, at the time the trial was resumed the trial court gave the following instructions to the jury:

"THE COURT: Good morning, ladies and gentlemen.

You may have a seat for a moment, Mr. Teer.

I want to great the jury, and you remember the instructions, of course, that I gave you Monday, and I want to give you one further instruction at this time, and I am confident that you can follow the instruction. I am going to read it. It's simple, and I am going to read it so that it's correct.

You obviously noticed that Mr. Herbert Goodman is not here nor is Mr. Walter. The case has been disposed of as to defendant Herbert Goodman. He is no longer of concern to you, and you should not speculate as to the reason for disposition. This disposition should not control or influence your verdict with reference to the remaining defendants. And you have had somewhat similar instructions before, ladies and gentlemen, and the reason behind it is the same reason as I expressed to you Monday, and that is you are to arrive at your verdict in this case based solely on the evidence and the testimony that you hear and see in this court while you are in the jury box and not anything that you may have read or heard or seen before, not during the trial, and I am confident that you can follow that, because the people of the United States and the defendants in this case are entitled to your fair and impartial consideration."

15. In *Williams*, the newspaper article in question gave an account of the defendants' second trial which was then under way. It stated that the defendants' first trial, in which they had been convicted, had been reversed because of the admission of "erroneous testimony."

"And finally, there was no showing that a juror read or even saw any of the alleged offending articles; it is merely urged that they must have seen them. To conclude on this basis that appellants were denied a fair trial would require the application of a dual presumption: that the jurors ignored the repeated instructions of the court and that they were prejudicially influenced by the news stories involved. Yet the law will presume neither." 438 F.2d at 873.

The newspaper article in this case was not printed in a place where it was readily accessible to one reading the paper. It appeared as a small 3 x 5½″ article printed at the bottom of an inside page of the business and sports section under the over-the-counter stock market quotations. In any event, this court stated in *Gordon* that the accused has the burden of showing jury prejudice. The court said:

". . . we are in accord with the view that where publicity prior to and during a trial is neither inherently prejudicial nor unusually extensive, the accused must assume the traditional burden and show actual jury prejudice." 438 F.2d at 874.

█ The newspaper article in our case was neither "inherently prejudicial" nor the publicity "unusually extensive." The Appellants simply failed to sustain their burden of showing "actual jury prejudice" because of the article.

The facts in *Gordon v. United States, supra,* were very similar to those in the instant case. In *Gordon,* there were two newspaper articles, one of which named the defendants. Both articles gave "factual reports of the proceeding and were barren of inflammatory matter." The trial court instructed the jury several times not to read or listen to the news media during the trial, and there was no showing that a juror read or saw any of the articles. Based on those facts, the court concluded that the trial court did not abuse its discretion in refusing to poll the jury.

█ Accordingly, we hold that the trial court did not abuse its discretion in refusing to grant a mistrial or poll the jury, and such refusal was not error. The Appellants' claim that Herbert Goodman's suicide is tantamount to a confession is unfounded in the absence of any evidence of why he committed such an act. Furthermore, we find the Appellants' argument that Herbert Goodman's suicide deprived the Appellants of their right to confront witnesses equally unfounded, because there was no showing that Herbert Goodman would have taken the stand to testify.

## VI. CONSECUTIVE SENTENCES FOR COUNTS 2 AND 3

The Appellants were indicted in Count 2 for manufacturing methaqualone and in Count 3 for possessing methaqualone with intent to distribute it.[16]

Both of these counts state offenses defined by 21 U.S.C.A. § 841(a)(1) which states as follows:

"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

16. "COUNT 2

From on or about September 1, 1976, and continuing thereafter up to and including August 18, 1977, at Dallas, Texas, in the Dallas Division of the Northern District of Texas, HERBERT EDWARD GOODMAN, also known as Charles Riccardi and Herbert Lash, DAVID IVAN GOODMAN, also known as Charles Riccardi and David Lash, PAUL ALEXANDER WEST, and DEBORAH CARRIER, defendants, knowingly and intentionally did manufacture quantities of methaqualone, a Schedule II controlled substance.

A violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

COUNT 3

On or about August 18, 1977, at Dallas, Texas, in the Dallas Division of the Northern District of Texas, HERBERT EDWARD GOODMAN, also known as Charles Riccardi and Herbert Lash, DAVID IVAN GOODMAN, also known as Charles Riccardi and David Lash, PAUL ALEXANDER WEST, and DEBORAH CARRIER, defendants, knowingly and intentionally did possess with intent to distribute approximately 80 pounds of a substance containing methaqualone, a Schedule II controlled substance.

A violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2."

"(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

■ The Appellants argue that the trial court erred in imposing consecutive sentences on Counts 2 and 3 because the offenses in those counts were defined by the same statute and the offenses arose from a single transaction. The general rule stated in the cases cited by the Appellants is that consecutive sentences for two violations of a single provision of a statute are improper where the evidence relied on for both violations is a single act or transaction. *Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957); *Goodson v. United States*, 564 F.2d 1071 (4 Cir. 1977); *United States v. Atkinson*, 512 F.2d 1235 (4 Cir. 1975); *United States v. Curry*, 512 F.2d 1299 (4 Cir. 1975), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975); *United States v. Stevens*, 521 F.2d 334 (6 Cir. 1975).

The recent en banc decision of this court in *United States v. Hernandez*, 591 F.2d 1019 (5 Cir. 1979), follows the general rule stated above. In *Hernandez*, the defendant was convicted both of possession with intent to distribute and distribution of heroin in violation of the same statute, 21 U.S.C.A. § 841(a)(1). The trial court imposed consecutive sentences for each conviction. After studying the evidence, this court decided that the imposition of consecutive sentences was improper because the evidence relied on for each conviction was a single transaction which merged into one completed offense. The court stated:

"The sentence for possession with intent to distribute combined with the consecutive sentence for distribution imposes double punishment for conduct that, under the facts of this case, merges into a single offense. The evidence of the sale

was relied upon to prove both Hernandez's constructive possession of the heroin and his intention to distribute it. There was no evidence of Pete's possession of a controlled substance with intent to distribute it apart from the evidence of the actual sale. When the intent to distribute was executed by a successful sale, the possession with intent to do so merged into the completed offense." 591 F.2d at 1022.

In that case the court discussed the holding in *United States v. Costello*, 483 F.2d 1366 (5 Cir. 1973) and distinguished it from *Hernandez* because *Costello* involved the violation of two different statutes, which required proof of different facts as to each separate offense.[17]

The Supreme Court set forth the test for determining whether cumulative punishment could be imposed for two offenses in its decision in *Blockburger v. United States, supra*, 284 U.S. at 304, 52 S.Ct. 180. In describing this test, the court stated in *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978):

"In *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 [52 S.Ct. 180, 76 L.Ed. 306] (1932), this Court set out the test for determining 'whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment.' *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). We held that '[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' *Blockburger v. United States, supra*, at 304, 52 S.Ct. at 182; see also *Brown v. Ohio, supra*, at

---

17. The court in *Costello* held that a single sale of LSD by the defendant to government agents was sufficient evidence to constitute two separate offenses, one under 21 U.S.C.A. § 844(a) and the other under § 841(a)(1), and, therefore, consecutive sentences were proper. In reaching its decision, the court applied the "different evidence" test which states that convictions for separate offenses arising from a single fact pattern are upheld if each statute proscribing the conduct requires proof of different facts and different elements as to each separate offense. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *United States v. Hill*, 500 F.2d 733 (5 Cir. 1974).

166, 97 S.Ct. at 2225; *Ianelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). The *Blockburger* test has its primary relevance in the double jeopardy context, where it is a guide for determining when two separately defined crimes constitute the 'same offense' for double jeopardy purposes. *Brown v. Ohio,* supra." 435 U.S. at 11, 98 S.Ct. at 912, 55 L.Ed.2d at 75, 76.

See also *United States v. Nelson*, 574 F.2d 277 (5 Cir. 1978), *cert. denied*, 439 U.S. 956, 99 S.Ct. 355, 58 L.Ed.2d 347. In *Simpson* the Supreme Court held that in a prosecution growing out of a single transaction of bank robbery with firearms a defendant may not be sentenced under both 18 U.S.C., § 2113(d) and 18 U.S.C., § 924(c). This court reached the same result in *United States v. Nelson, supra.*

■ The instant case is easily distinguished from the *Hernandez* case because the convictions for manufacturing methaqualone and for possession with intent to distribute it were not based on a single transaction, and required proof of different facts for each offense. The record contains abundant evidence showing the manufacturing and possession with intent to distribute methaqualone by Appellants at many different times.[18] Therefore, the search and seizure of the methaqualone operation on August 18, 1977, was not the only evidence relied on to show that the Appellants were manufacturing the controlled substance and possessing it with intent to distribute it during the period and on the dates alleged in Counts 2 and 3. Accordingly, we hold that the imposition of consecutive sentences under Counts 2 and 3 was proper under the facts of this case.

## VII. COUNT 3's STATEMENT OF AN OFFENSE

Count 3 reads that the Appellants "knowingly and intentionally did possess with intent to distribute . . . a substance containing methaqualone."[19] The Appellants contend that Count 3 does not allege an offense under 21 U.S.C.A. § 841(a)(1). They argue that Count 3 does not allege a knowing and intentional possession of a *controlled substance*, but instead alleges a knowing and intentional possession of a *substance* that contains a controlled substance. They presented this argument to the trial court in the form of a motion to dismiss but the trial court denied the motion.

■ A study of the case and statutory law reveals several general principles which should be considered here. These are as follows:

"Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

See also *United States v. Debrow*, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953); *Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932).

■ "Specificity does not determine the sufficiency of an indictment." *United States v. Guthartz*, 573 F.2d 225, 227 (5 Cir. 1978), *cert. denied*, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978). "Its [an indictment's] validity is determined by practical, not technical, considerations." *United States v. Guthartz, supra*, at 227; *United States v. London*, 550 F.2d 206 (5 Cir. 1977); *United States v. Markham*, 537 F.2d 187 (5 Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977). Rule 7(c)(1) of the Federal Rules of Criminal Procedure states, in pertinent part, as follows:

**18.** Deborah Carrier's testimony, the surveillance of the methaqualone operation, the deliveries of chemicals, and the analysis of the tablet punch used in the operation clearly indicated that methaqualone was being manufactured by the Appellants at different times between September, 1976, and August, 1977.

**19.** Count 3 is set out in full in footnote 17.

"The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."

In addition to complying with the foregoing general requirements, Count 3 is sufficient under other tests applied by the court. In *United States v. Arteaga-Limones*, 529 F.2d 1183 (5 Cir. 1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976), the defendant was charged with knowingly and intentionally importing a controlled substance which was a violation of 21 U.S.C.A. §§ 960(a)(1) and 952(a). One count of the indictment failed to allege the scienter elements of "knowingly and intentionally." In concluding that the count of the indictment was sufficient, this court considered the following facts: (1) The statutory section numbers accompanied the language in the count; (2) the jury was otherwise properly charged that they must find the scienter elements; (3) the indictment gave an adequate appraisal of the offense charged, and (4) the trial court instructed the jury on the elements of the offense which included the need for scienter. In the case of *United States v. McGough*, 510 F.2d 598 (5 Cir. 1975), this Court had a situation before it where the indictment failed to specifically allege an essential element of the offense, i. e., materiality. In deciding that the indictment was sufficient, this Court held that the indictment alleged sufficient facts to constitute an allegation of materiality even though the indictment did not specifically allege "materiality."

In the instant case, the Appellants insist that the government's failure to specifically allege that they "knowingly and intentionally possessed a controlled substance" was fatal to the indictment. We do not agree. Applying the general principles outlined above and as discussed in *United States v. Arteaga-Limones, supra*, and *United States v. McGough, supra*, to the facts in this case, we conclude as follows: the indictment as a whole alleged sufficient facts to clearly infer that the Appellants "knowingly and intentionally possessed a

controlled substance," because possession of a substance containing a controlled substance would itself constitute a violation of the statute. The controlled substance, methaqualone, was itself named. It was unnecessary to go further and describe it as a controlled substance. If identification of methaqualone as a controlled substance is significant, that identification is provided by the citation of the statute in the indictment. The defendants were supplied by the indictment with information that the substance which they possessed was a controlled substance; the jury was properly instructed in the trial court's charge on the elements of the offense; and the indictment gave an adequate appraisal of the offense charged. Count 3 also meets the test set out in *Hamling v. United States, supra*, because Count 3 contains all the elements of the offense, it fairly informs the Appellants of the charge against which they must defend, and it would enable the Appellants to plead a conviction in bar of a future prosecution for the same offense. We hold, therefore, that Count 3 of the indictment does sufficiently allege an offense under 21 U.S.C.A. § 841(a)(1). *Hamling v. United States, supra*; *United States v. Arteaga-Limones, supra*; *United States v. McGough, supra*.

## VIII. COUNT 2's SUPPORT IN THE VERDICT

Appellant West contends that Count 2 is not supported by the verdict because the trial court's charge did not require the jury to find that "quantities" of methaqualone were manufactured.[20]

We do not agree with Appellant West's contention. The term "quantities" is not an essential element of the offense charged under 21 U.S.C.A. § 841(a)(1), and, therefore, it was surplusage and may be disregarded. *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); *United States v. Greene*, 497 F.2d 1068 (7 Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). Such surplusage in an indictment need not be

**20.** Count 2 is set out in full in footnote 17.

proved. *United States v. Greene, supra; United States v. Trexler,* 474 F.2d 369 (5 Cir. 1973), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2759, 37 L.Ed.2d 157 (1973); *Castle v. United States,* 287 F.2d 657 (5 Cir. 1961). All of the essential elements of the offense were charged in the indictment in addition to the unnecessary term "quantities." The jury was properly charged on the elements of the offense, and, they found that in reaching their verdict, all necessary elements were present. Since "quantities" was not an essential element of the offense and did not have to be proved, the jury was not required to make a finding that "quantities" of methaqualone were manufactured by Appellants. Accordingly, we hold that Appellant West's conviction under Count 2 is supported by the jury's verdict.

## IX. SCHEDULING OF METHAQUALONE AS A CONTROLLED SUBSTANCE

Appellants contend further that methaqualone was never validly made a Schedule II controlled substance. They argue that the Acting Administrator of the Drug Enforcement Administration (DEA) did not have the authority to schedule methaqualone under 21 U.S.C.A. §§ 811 and 812.

The facts show that the Attorney General transferred his authority to schedule drugs as controlled substances to the DEA in 1973. 38 Fed.Reg. 18380 (1973). On June 29, 1973, the Attorney General issued Order No. 522–73 designating John R. Bartels "to perform the duties and act of Administrator of the Drug Enforcement Administration." The order which went into effect July 1, 1973, was never published in the Federal Register. On October 2, 1973, Mr. Bartels issued an order placing methaqualone in Schedule II of the controlled substances listed in 21 U.S.C.A. § 812. 38 Fed.Reg. 27519 (1973).

The constitutional issue of whether the Attorney General can properly delegate his power to schedule drugs as controlled substances to the DEA was considered by this court in *United States v. Gordon,* 580 F.2d 827 (5 Cir. 1978), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978). This court concluded that the delegation of the authority to schedule drugs to the DEA was "constitutionally permissible."

The delegation in the instant case involves an "acting administrator" and a delegation order that was not published in the Federal Register. The authority of the Attorney General to delegate his power to the Acting Administrator of the DEA is well settled. *United States v. Gordon, supra,* 28 U.S.C.A. § 510.[21] However, the validity of this delegation of authority is questioned by the Appellants because the order making it was not published.

There are two federal statutes which contain the requirements for publication in the Federal Register. They are 44 U.S.C.A. § 1505(a) and (b) and 5 U.S.C.A. § 552(a)(1).[22]

Title 5 U.S.C.A. § 552(a)(1) has been interpreted to mean that its "requirement for

---

**21.** § 510 Delegation of authority

The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General.

**22.** 44 U.S.C.A. § 1505. Documents to be published in Federal Register

(a) Proclamations and Executive Orders; documents having general applicability and legal effect; documents required to be published by Congress. There shall be published in the Federal Register— ·

(1) Presidential proclamations and Executive orders, except those not having general applicability and legal effect or effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof;

(2) documents or classes of documents that the President may determine from time to time have general applicability and legal effect; and

(3) documents or classes of documents that may be required so to be published by Act of Congress.

For the purposes of this chapter every document or order which prescribes a penalty has general applicability and legal effect.

(b) Documents authorized to be published by regulations; comments and news items excluded. In addition to the foregoing there shall also be published in the Federal Register other documents or classes of documents authorized to be published by regulations prescribed under

publication attaches only to matters which if not published would adversely affect a member of the public." *Hogg v. United States*, 428 F.2d 274, 280 (6 Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). In that case the court considered the nonpublication of internal instructions by the Attorney General to officers of the Department of Justice regarding their functions in the conduct of litigation in which the United States was a party. In deciding that the involved taxpayer would not be adversely affected by the nonpublication of the instructions in question, the court stated:

> "We hold that the Administrative Procedure Act does not require that all internal delegations of authority from the Attorney General must be published in order to be effective." 428 F.2d at 280.

Applying the statutory and case law publication requirements to the facts in the case before us, we find that there is no statutory provision which requires the publication of the appointment of the acting administrator. In addition, this appointment is not such a matter that if not published would adversely affect a member of the public. *Hogg v. United States, supra*; see also *Chevron Oil Co. v. Andrus*, 588 F.2d 1383 (5 Cir. 1979). We conclude, therefore, that the nonpublication of the Attorney General's order delegating authority to the Acting Administrator of the DEA did not affect its validity. Therefore, we hold that the Acting Administrator did have authority to schedule methaqualone as a Schedule II controlled substance, and that such scheduling was valid and proper. *United States v. Gordon, supra.*

Based on our disposition of the issues in this case as set out above, we hold that the Appellants' convictions are affirmed.

AFFIRMED.

---

this chapter with the approval of the President, but comments or news items of any character may not be published in the Federal Register.

. . . . .

5 U.S.C.A. § 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.